No. 21-14476-A

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

_____

JOHN S. LOWMAN IV, HOLLY LOWMAN, RICK BRIAN STEVENS,
MARYANN STEVENS, and JABIN BONNETT,

*Petitioners,*

v.

FEDERAL AVIATION ADMINISTRATION, and STEPHEN M. DICKSON, in
his official capacity as Administrator, Federal Aviation Administration,

*Respondents,*

CITY OF LAKELAND,

*Intervenor-Respondent.*

_____

On Petition for Review of an Order of the Federal Aviation Administration

_____

## PETITIONERS' OPENING BRIEF

_____

STEVEN M. TABER
DANIEL P. YEOMANS
Leech Tishman Fuscaldo & Lampl, Inc.
200 South Los Robles Ave., Suite 300
Pasadena, California 91101
Telephone: (626) 796-4000
Facsimile: (626) 795-6321
staber@leechtishman.com
dyeomans@leechtishman.com
*Attorneys for John S. Lowman IV, Holly Lowman, Rick Brian Stevens, Maryann*
*Stevens, and Jabin Bonnett*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

I hereby certify as required by Eleventh Circuit Rules 26.1-1 through 26.1-5 that, to the best of my knowledge, the following is a complete list of persons and entities that have an interest in the outcome of this case:

Amazon.com, Inc. (AMZN)

Amazon Services

Bonnett, Jabin, *Petitioner*

City of Lakeland, Florida, *Intervenor-Respondent*

Conrad, Eugene, *Airport Director, City of Lakeland, Florida*

Davis, Palmer, *City Attorney for the City of Lakeland, Florida*

Dickson, Stephen M., *Respondent*

Leech Tishman Fuscaldo & Lampl, Inc., *Counsel for Petitioners*

Lowman, Holly, *Petitioner*

Lowman IV, John S., *Petitioner*

Mutz, H. William, *Mayor of the City of Lakeland, Florida*

Stevens, Maryanne, *Petitioner*

Stevens, Brian Rick, *Petitioner*

Taber, Steven M., *Counsel for Petitioners*

Yeomans, Daniel P., *Counsel for Petitioners*

.

STEVEN M. TABER
DANIEL P. YEOMANS
Leech Tishman Fuscaldo & Lampl, Inc.
200 South Los Robles Ave., Suite 300
Pasadena, California 91101
Telephone: (626) 796-4000
Facsimile: (626) 795-6321
staber@leechtishman.com
dyeomans@leechtishman.com

**STATEMENT REGARDING ORAL ARGUMENT**

Petitioners request oral argument in this matter. Oral argument will assist the Court in determining the important issues presented regarding subject matter jurisdiction within the specific context of this case, including assisting the Court in understanding the factual and historical background. Oral argument will also assist the Court in assessing the record, including the administrative record submitted by the Federal Aviation Administration.

# TABLE OF CONTENTS

## Table of Contents

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
    DISCLOSURE STATEMENT .............................................................1

STATEMENT REGARDING ORAL ARGUMENT ...................................... i

TABLE OF CONTENTS ................................................................................. ii

GLOSSARY OF DEFINED TERMS ............................................................. xi

STATEMENT OF JURISDICTION ........................................................... xiii

STATEMENT OF THE ISSUES ....................................................................1

STATEMENT OF THE CASE AND FACTS ..................................................2

I.     Aviation Noise and Emission Have Been Recognized as a Critical
      Public Health Issue. .............................................................................2

   A.  FAA Recognizes that Aviation Noise Is a Public Health Issue. ...........2

       1.     FICAN Research Review of Selected Aviation Noise Issues
             (April 2018). ................................................................................2

       2.     WHO Environmental Noise Guidelines for European Region
             (October 2018). ...........................................................................3

       3.     Analysis of the Neighborhood Environmental Survey (January
             2021). ..........................................................................................4

   B.  Aviation Emissions are a Growing Source of Concern for Risks to
      Public Health. ......................................................................................5

II.    Procedural Framework ..........................................................................7

   A.  The Airport's Intermodal Feasibility Study Outlines Development of
      International Air Cargo Facility .............................................................7

   B.  The Development of Aircraft Maintenance, Repair, and Overhaul
      Hangars and Air Cargo Facility Environmental Assessment is Drafted.
      ............................................................................................................8

   C.  "Revalidation" of Existing Environmental Assessment. ....................10

   D.  Phase II Environmental Assessment ...................................................15

SUMMARY OF ARGUMENT.....................................................................18

ii

ARGUMENT/CITATIONS OF AUTHORITY ..........................................21

I.    Petitioners Have Article III Standing to Bring this Petition for
      Review. ...................................................................................21

      A. Concrete and Particularized Actual Injury ..........................22

      B. Petitioners' Injuries are Fairly Traceable to the Challenged Action...23

      C. Petitioners Continue to Suffer Concrete Injuries Which Would be
         Redressed by the Court's Favorable Decision Vacating the FAA's
         FONSI/ROD for the Project ................................................24

II.   Standard of Review for NEPA Claims..................................24

III.  FAA Failed to Evaluate the Impacts of Constructing the Air Cargo
      Facility in Accordance with its NEPA Obligations. ...........................26

      A. FAA Unlawfully Segmented its Review of Interconnected and
         Interdependent Projects Constructing an Air Cargo Facility at the
         Airport. ...................................................................................27

         1.   FAA May Not Artificially Break Up a Single Project to Avoid
              Assessing Environmental Impacts. ...........................................27

         2.   The Project Is Part of a Single, Larger Project. ........................30

         3.   FAA and the City Were Required to Draft a Supplemental EA
              that Covered all of the Component Projects Connected to the
              Construction of the Air Cargo Facility at the Airport..............36

      B. FAA Violated NEPA by Failing to Take into Consideration the
         Cumulative Impact of Its Past Actions Thereby Creating a False
         Baseline. ...............................................................................39

         1.   FAA's cumulative impact analysis in the Phase II EA is
              inadequate and fails to comply with NEPA..............................40

         2.   FAA violated NEPA by failing to consider the cumulative
              impact of its past actions.........................................................42

         3.   The "Affected Environment" in the Phase II EA Is Unduly
              Restrictive and is in Violation of NEPA and FAA Orders..,,,,,,46

         4.   FAA's Use of "No Action" Conditions for Its Noise Baseline
              Fails to Capture the Impacts of Noise from FAA's Actions
              Prior to the Project. ................................................................48

IV.   The FAA Violated NEPA by Failing to Analyze All Air Quality
      Impacts ...................................................................................52

CONCLUSION................................................................................................59

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*350 Mont. v. Haaland*,
    9 F. 4th 1158 (9th Cir. 2022) ...................................................................42

*Alabama v. United States Army Corps of Eng'rs*,
    424 F.3d 1117 (11th Cir. 2005) ...........................................................21

*Allied-Signal v. Nuclear Regulatory Comm'n*,
    988 F.2d 146 (D.C. Cir. 1993) ...............................................................59

*Alpharma, Inc. v. Leavitt*,
    460 F.3d 1 (D.C. Cir. 2006) ...................................................................41

*Am. Bird Conversancy, Inc. v. FCC*,
    516 F.3d 1027 (D.C. Cir. 2008) ............................................................29

*Ark. Wildlife Fed'n v. U.S. Army Corps of Eng'rs*,
    431 F.3d 1096 (8th Cir. 2005) ..............................................................38

*Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.*
    462 U.S. 87, 97, 76 L. Ed. 2d 437, 103 S. Ct. 2246 (1983) ...............25

*Black Warrior Riverkeeper, Inc. v. U.S Army Corps of Eng'rs*,
    833 F.3d 1274 (11th Cir. 2016) ............................................................53

*City of Boston Delegation v. FERC*,
    897 F.3d 251-2 (D.C. Cir. 2018) ..........................................................29

*Coal. On Sensible Transp. v. Dole*,
    826 F.2d 60 (D.C. Cir. 1987) .................................................................28

*Del. Riverkeeper Network v. FERC*,
    753 F.3d 1304 (D.C. Cir. 2014) .............................................29, 30, 35

*DOT v. Public Citizen*,
    541 U.S. 752 (2004) ..........................................................................25, 26

*Fla. Wildlife Fed'n v. United States Army Corps of Eng'rs*,
  401 F. Supp. 2d 1298 (S.D. Fla. 2005) ............................................................. 26

*Florida Manufactured Hous. Ass'n v. Cisneros*,
  53 F.3d 1565 (11th Cir. 1995) ............................................................ xiii

*Florida Wildlife Federation v. United States Army Corps of
  Engineers*,
  401 F Supp.2nd 1298 (2005) ............................................................. 26

*FOE v. United States Army Corps of Eng'rs*,
  109 F. Supp. 2d 30 (D.D.C. 2000) ....................................................... 40

*Fund for Animals v. Clark*,
  27 F. Supp. 2d 8 (D.D.C. 1998) ......................................................... 34

*Fund for Animals v. Clark*,
  27 F. Supp. 2d 9 (D.D.C. 1998) ...................................................... 28, 35

*Grand Canyon Trust v. FAA*,
  290 F.3d 339 (D.C. Cir. 2002) .................................................. 39, 40, 43, 45

*Habitat Educ. Ctr., Inc. v. U.S. Forest Serv.*,
  593 F. Supp. 2d 1019 (E.D. Wis. Jan. 2009) ............................................ 42, 43

*Hammond v. Norton*,
  370 F.Supp.2d 226(D.D.C. 2005) ..................................................... 29, 30

*Klamath Siskiyou Wildlands Ctr. v. Boody*,
  468 F.3d 549 (9th Cir. 2006) ........................................................... 38

*Manatee County v. Gorsuch*,
  554 F. Supp. 778 (M.D. Fla. 1982) ...................................................... 28

*Marsh v. Oregon Natural Resources Council*,
  490 U.S. 360 ..................................................................... 36, 37, 38

*New York v. Nuclear Regulatory Comm'n*,
  681 F. 3d 471 (D.C. Cir. 2012) ......................................................... 59

*Norton v. Southern Utah Wilderness Alliance*,
  542 U.S. 55 (2004) ................................................................. 36, 38

*NRDC v. Callaway*,
　524 F.2d 79 (2d Cir. 1975) ..................................................28

*NRDC v. Hodel*,
　865 F.2d 288 (D.C. Cir. 1988)....................................28, 39, 40

*Ohio Valley Envtl. Coalition v. Hurst*,
　604 F. Supp. 2d 860 (S.D.W.Va. 2009)..............................43

*In re Operation of Mo. River Sys. Litig.*,
　516 F.3d 688 (8th Cir. 2008) ............................................38

*Save the Yaak Comm. v. Block*,
　840 F.2d 714 (9th Cir. 1988) ............................................28

*Sierra Club v. Bosworth*,
　510 F.3d 1016 (9th Cir. 2007) ..........................................42

*Sierra Club v. Martin*,
　168 F.3d 1 (11th Cir. 1999) ..............................................26

*Sierra Club v. U.S. Army Corps of Eng'rs*,
　295 F.3d 1209 (11th Cir. 2002) ........................................38

*Simmons v. Block*,
　782 F.2d 1545 ..................................................................26

*St. Johns Riverkeeper, Inc. v. United States Army Corps of Eng'rs*,
　462 F. Supp.3d 1256 (M.D. Fla. 2020)..............................43

*Taxpayers Watchdog, Inc. v. Stanley*,
　819 F.2d 294 (D.C. Cir. 1987)..........................................29

*Thomas v. Peterson*,
　753 F.2d 754 (9th Cir. 1985) ............................................28

*TOMAC v. Norton*,
　433 F.3d 852 (D.C. Cir. 2006)..........................................39

*Town of Huntington v. Marsh*,
　859 F.2d 1134 (2d Cir. 1988) ...........................................28

*TVA v. Hill,*
    437 U.S. 153, 98 S. Ct. 2279, 57 L. Ed. 2d 117 (1978) ..................................36

*Utah v. Evans,*
    536 U.S. 452 (2002) ..................................................................................23

*W.N.C. Alliance v. N.C. DOT,*
    312 F.Supp. 2d 765 (E.D.N.C. 2003) ...........................................................31, 32

*Wetlands Action Network v. U.S. Army Corps of Engineers,*
    222 F.3d 1105 (9th Cir. 2000) ....................................................................31

**Statutes**

5 U.S.C. § 706(2)(A), (D) ..............................................................................23

42 U.S.C. 7506(c) ........................................................................................52

42 U.S.C. § ................................................................................................xi

42 U.S.C. § 4332(2)(C) ..................................................................................24

42 U.S.C. § 4332(2)(C), (E) ............................................................................24

42 U.S.C. § 4332(2)(E) ..................................................................................25

42 U.S.C. §7401 et seq. (1970) .......................................................................xi

42 U.S.C. § 7412 .........................................................................................54

49 U.S.C. § 46110 .......................................................................................xiii

49 U.S.C. § 46110(a) ....................................................................................xiii

**Other Authorities**

40 C.F.R. Parts 1500- ...................................................................................xi

40 C.F.R. Parts 1500-1508 ............................................................................24

40 C.F.R. § 150.15 .......................................................................................47

40 C.F.R. § 1500.1 .......................................................................................42

40 C.F.R. § 1501.3 .......................................................................................25

40 C.F.R. § 1502.9(c)(1) ...........................................................37

40 C.F.R. § 1502.15 ..................................................................47

40 C.F.R. § 1506.1 ....................................................................24

40 C.F.R. § 1508.4 ....................................................................25

40 C.F.R. § 1508.7 ..............................................................39, 45

40 C.F.R. § 1508.9 ..............................................................xi, 25

40 C.F.R. § 1508.24(a)(3) ........................................................34

40 C.F.R. § 1508.25(a) .............................................................29

40 C.F.R. § 1508.25(a)(1) ...................................................30, 33

40 C.F.R. § 1508.25(a)(3) .......................................30, 34, 35, 36

40 C.F.R. § 1508.27 ..................................................................38

40 C.F.R. § 1508.27(b)(7) .........................................................28

40 CFR 1502.9(c) ......................................................................37

40 CFR § 1500.1(c) (2003) .......................................................25

FAA Order 1050.1F .................................................13, 39, 47, 53

FAA Order 1050.1F, AR 203, § 2-3.2(bn) ...............................30

FAA Order 1050.1F's .................................................................14

FAA Order 1050.1F, § 4-2(d)(3) ...............................................39

FAA Order 1050.1F, § 5-1(b), AR 203, pp. 5-1 ........................13

FAA Order 1050.1F § 5-2(b)(8) ...........................................52, 53

FAA Order 1050.1F § 9-1, p.9-1 ...............................................12

FAA Order 1050.1F, § 9-3, p. 9-3 .............................................37

FAA Order 1050.1F § B-1.3, p. B-2 ..........................................47

§ 1501.3(b)(2)(iv). FAA Order 1050.1F ....................................................52

FAA Order 5050.1B .................................................................................52

FAA Order 5050.4B .................................................................................52

FAA Order 5050.4B, § 1402 .....................................................................37

## GLOSSARY OF DEFINED TERMS

| | | |
|---|---|---|
| AGL | | Above Ground Level |
| Airport | | Lakeland Linder International Airport (three letter identifier: LAL) |
| APA | | Administrative Procedure Act, 5 U.S.C. §§ 701 –706 |
| CAA | | Clean Air Act, 42 U.S.C. §7401 et seq. (1970) |
| CATEX | | Catex Categorical Exclusion |
| CEQ Regulations | | 40 C.F.R. Parts 1500-1508 |
| CEQ Handbook | | *Council on Environmental Quality, Considering Cumulative Effects Under the National Environmental Policy Act* (January 1997) |
| DNL | | Day Night Average Sound Level |
| EA | | Environmental Assessment; 42 U.S.C. § 4332(2)(E); 40 C.F.R. § 1501.3; 40 C.F.R. § 1508.9 |
| EIS | | Environmental Impact Statement; 42 U.S.C. § 4332(2)(C) |
| FAA | | Federal Aviation Administration |
| FAA Primer | | *Aviation Emissions, Impacts & Mitigation: A Primer*, January 2015 |
| FICAN | | Federal Interagency Committee on Aviation Noise |
| FICON | | Federal Interagency Committee on Noise |
| FONSI/ROD | | FAA's October 29, 2021 Finding of No Significant Impact/Record of Decision |

| | | |
|---|---|---|
| ISO | | International Organization for Standardization |
| Phase I EA | | Environmental Assessment conducted for the construction of three MRO hangars on an air cargo facility, dated August 30, 2016 |
| Phase II EA | | Environmental Assessment conducted for the expansion of the Amazon Air Cargo Facility at Lakeland Linder International Airport Dated October 29, 2021 |
| NEPA | | National Environmental Policy Act |
| NES | | Neighborhood Environmental Survey |
| MRO | | Maintenance, Repair, and Overhaul |
| Project | | Construction of the Amazon Air Cargo Facility at Lakeland Linder International Airport |
| SIP | | State Implementation Plan |

## STATEMENT OF JURISDICTION

Under 49 U.S.C. § 46110(a), this Court has jurisdiction over this petition for review of the Federal Aviation Administration's ("FAA") October 29, 2021, Finding of No Significant Impact/Record of Decision ("FONSI/ROD") that approved the FAA Proposed Action related to the construction of an Amazon air cargo facility at Lakeland Linder International Airport and found those changes to be consistent with existing national environmental policies and objectives.

FAA's FONSI/ROD states that it is "FAA's final decision and approval for the actions identified in the EA and constitutes a final order of the FAA Administrator and is subject to review by the Courts of Appeal of the United States in accordance with the provisions of 49 U.S.C. § 46110." See *Florida Manufactured Hous. Ass'n v. Cisneros*, 53 F.3d 1565, 1574 (11th Cir. 1995).

All of Petitioners in this petition for review were residents or had their principal place of business within the Eleventh Circuit when they timely filed this petition for review on or before December 28, 2021, within the 60-day period for seeking review under § 46110(a).

## STATEMENT OF THE ISSUES

1.      Did the FAA violate the National Environment Policy Act ("NEPA") by segmenting its review of the environmental impacts resulting from the development and construction of the Amazon air cargo facility at Lakeland Linder International Airport through the issuance of its October 29, 2021 "Finding of No Significant Impact and Record of Decision - Environmental Assessment for Phase II Air Cargo Facility Development at Lakeland Linder International Airport"?

2.      Did FAA violate NEPA by failing to consider the cumulative impact of its past actions, resulting in a false environmental baseline used to evaluate and assess the impact of the Phase II Air Cargo Facility Development at Lakeland Linder International Airport?

3.      Did the FAA violate NEPA by failing to analyze and address all air quality impacts of the Phase II Air Cargo Facility Development at Lakeland Linder International Airport in compliance with the underlying purpose and requirements of NEPA?

## STATEMENT OF THE CASE AND FACTS

### I.  Aviation Noise and Emission Have Been Recognized as a Critical Public Health Issue.

There is growing scientific evidence linking flights over noise sensitive residential areas, such as the Petitioners' homes, to substantial health impacts. This has raised a concern about public health and welfare of the residents living below those flight paths. As FAA acknowledges in its Neighborhood Environmental Survey, these impacts to the public's health and welfare lie outside the obsolete 65 DNL contour.

### A. FAA Recognizes that Aviation Noise Is a Public Health Issue.

In response to public comments, the Environmental Assessment conducted for the expansion of the Amazon Air Cargo Facility at Lakeland Linder International Airport Dated October 29, 2021("Phase II EA") mentions three reports regarding aviation noise. These three reports all conclude that aviation noise is detrimental to the public health and that it harms people beyond the 65 DNL contour.

#### 1.  FICAN Research Review of Selected Aviation Noise Issues (April 2018).

In 1992, the Federal Interagency Committee on Noise (FICON) developed a dose-response curve ("FICON Curve") showing that 12.3% persons were "highly

annoyed" by a Day-Night Average Sound level (DNL) of 65 dB, (AR[1] 20, p. 2).

FAA used the FICON Curve to set a significance threshold of 65 DNL, which has

governed FAA noise policy ever since. FICAN recognizes the need to update these

standards (AR 210, pp. 2-3), as well as the fact that annoyance and sleep

disturbance were poorly understood in 1992. AR 210, pp.3-7.

### 2. WHO Environmental Noise Guidelines for European Region (October 2018).

In October 2018, the World Health Organization Regional Office for Europe

published its Environmental Noise Guidelines for the European Region. Those

Guidelines found that aviation noise was connected to higher incidence of ischemic

heart disease, hypertension, "prevalence of 'highly annoyed'" population, and a

delay in reading skills and oral comprehension in children. AR 208. As a result,

WHO made the strong recommendation that average noise exposure noise levels

produced by aircraft be reduced below 45 dB DNL, as aircraft noise above this

level is associated with adverse health effects. AR 208, pp. xvii, 61.

WHO also made the strong recommendation that noise levels produced by

aircraft be reduced during nighttime below 40 dB DNL, as aircraft noise above this

level is associated with adverse effects on sleep. WHO strongly recommended that

---

[1] AR refers to the document number in the Administrative Record.

to reduce health effects policymakers implement "suitable measures to reduce noise exposure from aircraft in the population exposed to levels above the guideline values for average and night noise exposure." AR 208, pp. xvii, 61.

### 3.  Analysis of the Neighborhood Environmental Survey (January 2021).

As WHO indicates, research published in the two decades since the release of the FICON report suggests that the FICON curve substantially under-estimates annoyance due to aircraft noise exposure. NES, p. ix (AR 224, p. 15). The Neighborhood Environmental Survey (NES), conducted for FAA and published in January 2021, confirmed that suggestion. As the NES pointed out, "[t]he Federal Interagency Committee on Noise (FICON) performed the *most recent* in-depth U.S. Government agency review of human annoyance to noise *in 1992*. The dose-response curve that FICON developed in 1992 confirmed the appropriateness of Federal policy at that time." *Id*. The NES concludes that "the percentage of those surveyed who were highly annoyed by aircraft noise increased monotonically with increasing noise exposure. In comparison to prior studies on this topic, the NES's national curve shows substantially more people highly annoyed for a given DNL aircraft noise exposure level." NES, p. xi, AR 224, p. 17. The NES compared its findings of the percent of population "highly annoyed" due to noise exposure with the 1992 FICON Report:

- At a noise exposure level of DNL 65 dB, the 1992 FICON Report indicated <u>12.3%</u> of people were highly annoyed, compared to <u>60.1% - 70.9%</u> from the NES.

- At a noise exposure level of DNL 60 dB, the FICON Report indicated that <u>6.5%</u> of people were highly annoyed, compared to <u>43.8% - 53.7%</u> from the NES.

- At a noise exposure level of DNL 55 dB, the FICON Report indicated that <u>3.3%</u> of people were highly annoyed, compared to <u>27.8% - 36.8%</u> from the NES.

- At a noise exposure level of DNL 50 dB, the FICON Report indicated that <u>1.7%</u> of people were highly annoyed, compared to <u>15.4% - 23.4%</u> from the NES.

NES, p. 56, AR 224, p. 78. FAA knew when it developed the Phase II Environmental Assessment that many more people in the areas around Lakeland would be "highly annoyed" than what FAA's models showed.

### B. Aviation Emissions are a Growing Source of Concern for Risks to Public Health.

In a recent study regarding aviation, researchers found that jet engine emissions contain large amounts of nano-sized particles, which are prone to reach

the lower airways of the human body upon inhalation. [2] They found that the size of particles and emission levels depend on type of aircraft, engine conditions, and fuel type, as well as on operation modes. Moreover, the researchers reported that exposure to jet engine emissions is associated with biomarkers of exposure and biomarkers of effect among airport personnel, especially in ground-support functions, and in residential areas in proximity to airports and flight paths. This causes an increased risk of disease, increased hospital admissions and self-reported lung symptoms among those exposed. The study concludes there is evidence that jet engine emissions have physicochemical properties similar to diesel exhaust particles, and that exposure to jet engine emissions is associated with similar adverse health effects as exposure to diesel exhaust particles and other traffic emissions.

Likewise, using a multi-scale modeling approach, a 2022 study quantified and monetized the air quality impact of civil aviation emissions to approximate the effects of aircraft plume dynamics-related local dispersion (1 km), near-airport

---

[2] *A review of health effects associated with exposure to jet engine emissions in and around airports*, Katja M. Bendtsen, Elizabeth Bengtsen, Anne T. Saber and Ulla Vogel. Environmental Health (2021) https://ehjournal.biomedcentral.com/track/pdf/10.1186/s12940-020-00690-y.pdf ) (last accessed July 29, 2022)

dispersion (10 km), regional (1000 km) and global (10,000 km) scale chemistry and transport. [3] The study used concentration-response functions to estimate premature deaths due to population exposure to aviation-attributable PM2.5 and ozone, finding that aviation emissions cause 16,000 premature deaths per year. Of these, emissions from landings and take-offs contribute a quarter. The study estimated that premature deaths due to long-term exposure to aviation-attributable PM2.5 and ozone lead to costs of $21,000,000,000.00 per year. The study compared these costs to other societal costs of aviation and finds they are on the same order of magnitude as global aviation-attributable climate costs, and one order of magnitude larger than aviation-attributable accident and noise costs.

## II.    Procedural Framework

### A. The Airport's Intermodal Feasibility Study Outlines Development of International Air Cargo Facility

In July 2015 the Lakeland Linder International Airport (the "Airport") published its *Intermodal Feasibility Study*. AR 202. That report called for the

---

[3] *Global, regional and local health impacts of civil aviation emissions*, Steve H L Yim, Gideon L Lee, In Hwan Lee, Florian Allroggen, Akshay Ashok, Fabio Caiazzo, Sebastian D Eastham, Robert Malina and Steven R H Barrett. Environmental Research Letters (2015) https://iopscience.iop.org/article/10.1088/1748-9326/10/3/034001/pdf (Last accessed July 29, 2022)

Airport to "develop preliminary plans and costs for the construction of an intermodal [air cargo] facility … Rough estimates show the need for a 50,000 square foot facility at $13.4 million." AR 202, p. 73. Besides the air cargo facility, the report stated that "[t]o accommodate larger air cargo aircraft, certain airfield modifications will be needed." While it did not specify what those modifications would be, the Airport estimated the cost to be roughly $2.3 million, with the Airport's share being $230,000. *Id.*

### B. The Development of Aircraft Maintenance, Repair, and Overhaul Hangars and Air Cargo Facility Environmental Assessment is Drafted.

To facilitate the projects suggested in the *Intermodal Feasibility Study,* in July 2016, the Airport conducted its *Aircraft Maintenance, Repair and Overhaul Hangars and Air Cargo Facility* environmental assessment ("Phase I EA"). The FAA issued its Finding of No Significant Impact/Record of Decision ("FONSI/ROD") on August 30, 2016. Both the Phase I EA and the FONSI/ROD are in AR 23.

The purpose and need of the Phase I EA indicates that the primary need at the Airport was to construct three "MRO" (Maintenance, Repair and Overhaul) hangars. Phase I EA, AR 23, p. 9. The Phase I EA states it is for the "[i]nitial construction and operation of one large aircraft maintenance hangar. Two additional aircraft maintenance hangars and one air cargo building could be

8

constructed at the site concurrently or within five years of the initial hangar, as demand dictates. *The footprint of the four buildings would total approximately 223,000 square feet.*" Phase I EA, AR 23, p. 6 (emphasis added). The proposed size of the air cargo facility from the Phase I EA was about 56,000 square feet. This is the size suggested by the *Intermodal Feasibility Study*.

As the Phase I EA points out, MRO facilities do not induce as many new aircraft operations as compared to an air cargo facility. Upon completion of the large MRO hangar, the Phase I EA says that it will cause an increase of 50 commercial and 36 general aviation operations. Phase I EA, AR 23, p.7. But, once the air cargo facility is constructed, along with the other 2 MRO hangars, the Phase I EA predicted an increase of 100 commercial, 96 general aviation, and *820 air cargo* aircraft operations. *Id.* The Phase I EA does not mention any community involvement or community outreach. The public notice of the Draft Phase I EA was buried in the legal notices section of a local newspaper and on the Airport website. AR 23, pp. 175-176. No community members commented on it. Five days after the end of the public comment period, the Airport finalized the Phase I EA and eight days after that the FAA issued its FONSI/ROD. AR 23, p. 10.

FAA based its FONSI/ROD in part on the fact that "the development of the cargo facility is anticipated to attract one scheduled large cargo aircraft per day

with a second large daily aircraft during peak periods (approximately 45 days per year)."[4] AR 23, p.8.



*Figure 1, Detail from "MRO" Environmental Assessment*

## C. "Revalidation" of Existing Environmental Assessment.

However, the project that was studied in 2016 never got built and it languished for two years. Then, in July 2018, the Airport sought "revalidation" of the 2016 Phase I EA stating that the 2016 Phase I EA was "unchanged." Moreover,

---

[4] Each arrival or departure is considered to be one "aircraft operation." One scheduled flight usually amounts to two aircraft operations (i.e., one arrival and one departure). Thus, 365 "scheduled large cargo aircraft" flights amount to 730 aircraft operations. When you add another 90 aircraft operations from the "second large daily aircraft [for] … approximately 45 days per year" you arrive at 820 aircraft operations per year induced by the proposed air cargo facility, the amount predicted in Phase I EA.

the Airport told the FAA that it was still proposing three MRO hangars, and one air cargo facility covering a total of 223,000 square feet for all four buildings. July 12, 2018 Letter, AR 25, p.3. However, the Airport said, "it would be more advantageous to [their secret prospective tenant's] operations to orient the cargo building the opposite direction on the site." *Id.*



*Figure 2, Detail from "Revalidation," AR 25, Exhibit 3*

Based on new information received from the "potential tenant" of the air cargo facility, the Airport predicted the number of air cargo operations to rise from 820 per year to 5,840 per year by 2023 (8 daily flights). The City argued in its July 12, 2018, letter that the "type of facilities in the 2016 FONSI remain unchanged, and the overall footprint is reduced." Unknown to the Petitioners and residents of

Lakeland, the City was in clandestine negotiations with Amazon for the Airport to be a hub for its "Prime Air," which would require a much larger air cargo facility than contemplated by either the Phase I EA or the *Intermodal Feasibility Study*.

Where the scope of a project changes, FAA Order 1050.1F § 9-1, p.9-1, requires a "written re-evaluation." A written re-evaluation is also required when no major steps towards implementation of the proposed action[5] have been commenced within three years from issuance of the FONSI. AR 203, p. 97. Although the scope of the project had changed and no major steps toward implementation had been taken, FAA concluded on September 25, 2018, that "a Written Re-evaluation of the 2016 EA is not required." AR 24, p.3.

None of the documents regarding the "revalidation" were made public. There was no public outreach. There was no opportunity for public comment. Including them as part of the Administrative Record in this Petition for Review is the first time that Petitioners were aware that these documents existed.

On May 20, 2019, the City approved an initial Amazon air cargo facility of 225,000 square feet. This significantly increased the size of the air cargo facility's

_____

[5] The Administrative Record does not contain any evidence that major steps towards implementation of the three MRO Hangars or the Air Cargo Facility were commenced before August 16, 2019.

12

footprint and increased fourfold the number of cargo flights once constructed. The contract allowed Amazon to expand the air cargo facility and the City was required to assist Amazon in obtaining the approvals for the expansion. There was no public debate about whether the City should contract with Amazon, nor was the Lease made public for their review.

The City's contract with Amazon also required the City to:

- Upgrade instrument landing systems at the airport that would facilitate aircraft operations in inclement weather from "CAT II" to a "CAT III" facility (Lease, ¶ 5.1(b), p.7);

- Rehabilitate Runway 9-27, (Lease, ¶ 5.1(c), p.7); and,

- Add five additional 15,000-gallon fuel tanks, three on the south side of the Airport and two on the north side of the Airport (Lease, Addendum 4-2, ¶ 1.a.ii).

FAA Order 1050.1F specifically states that "a CATEX [Categorical Exclusion] should not be used for a segment or an interdependent part of a larger proposed action." FAA Order 1050.1F, § 5-1(b), AR 203, pp. 5-1. Yet on May 30, 2019, FAA categorically excluded the rehabilitation of Runway 9-27 (May 30, 2019, CATEX, p.1 AR 90) segment of the project. And, on April 27, 2021, FAA categorically excluded the upgraded landing systems that would facilitate aircraft operations in inclement weather from the project. April 27, 2021, CATEX, p.A-22,

AR 99). The CATEX specifically ties the upgraded landing systems to Amazon's requirements. ("The proposed upgrade to the ILS system is to meet the current operational needs of an air cargo service provider . . ."). *Id.*, p.A-1. Despite FAA Order 1050.1F's prohibition on using a CATEX for a "segment or an interdependent part," neither of these projects were included in either the Phase I EA or the Phase II Environmental Assessment, despite their interdependence on constructing the air cargo facility.

When the air cargo facility opened in June 2020, it looked nothing like the facility in the 2016 Phase I EA, nor did it look anything like the facility that was "revalidated" in 2018. The facility that opened in the summer of 2020 encompassed the Airport property that had been previously set aside for two MRO hangars and an air cargo facility. And, far from reducing the footprint of either the building or the covered concrete areas, the footprint for both increased. The facility clocks in at 225,000 square feet – a far cry from the 55,000 square foot facility that the Airport had imagined back in 2016. The number of aircraft parking spots grew from four large aircraft in 2016, (AR 23, p. 78) to five large aircraft in 2018 (July 12, 2018 Letter, AR 25, p. 12) to an as-built size capable of parking six large cargo aircraft, primarily Boeing 767's and 737's (AR 7, p. 39).



*Figure 3, Air Cargo Facility as built, AR 7, p. 39*

This switch from a relatively small air cargo facility (around 55,750 sq, ft.) to a facility four times the proposed size (225,000 sq. ft.) happened largely behind closed doors and outside the public's view and scrutiny. The environmental impact of an air cargo facility four times the size of the air cargo facility originally proposed in 2016 has never been studied.

### D. Phase II Environmental Assessment

Almost immediately after the lease with Amazon had been approved by the City and before the initial "air cargo facility" had even begun construction, let alone opened, Amazon exercised its legal right to expand the air cargo facility. January 29, 2020, Email Thread, AR 253, p.1. On January 21, 2020, the Airport

held a kick-off meeting for the "Phase II Environmental Assessment." "Phase II" contemplated an air cargo facility that would be about 11 times the size of the facility mentioned in the Phase I EA, inducing over 19 times the number of new flights at the Airport.

Amazon began operations at its new facility at the Airport on July 23, 2020. Sara-Megan Walsh, *Amazon Air arrives at Lakeland Linder International Airport with 1st cargo flight*, Lakeland Ledger (July 23, 2020), https://www.theledger.com/story/news/2020/07/23/amazon-air-arrives-at-lakeland-linder-with-1st-cargo-flight/112571136/. Even without the benefit of the expanded facility, in two years the Amazon facility has operated at the Airport, Lakeland Linder International Airport has moved from handling no air cargo to becoming the 4th busiest air cargo airport in Florida. Paul Nutcher, *Lakeland Linder is the 4th busiest cargo airport in Florida and getting busier, director says*, Lakeland Ledger (June 13, 2022). The most recent data show that Amazon is sending 13 air cargo flights a day (26 aircraft operations) into and out of the Airport. *Id.* That is 9,490 aircraft operations a year. The Phase I EA predicted that the air cargo facility approved would induce only 820 new aircraft operations a year by 2023. Phase I EA, AR 23, p.7. The Revalidation was only marginally better. It predicted that the air cargo facility would induce 5,840 aircraft operations a year by 2023. July 12, 2018, Letter, AR 26, p.3. The Project calls for a 392,200 square foot expansion,

16

almost tripling the current square footage. Phase II EA, AR 7, p.1-2. Yet the Phase II EA says that the expansion will only produce an additional 8 flights a day (16 operations) in the first year of operations, with only 12 additional flights by the fifth year of operation. Phase II EA, AR 7, p.1-6.

During the public comment period for the Phase II EA, FAA received over 200 comments complaining about the noise created by the 225,000 sq. ft. air cargo facility and worried about the noise impact that almost tripling the size of the facility to 617,000 sq. ft. would have on them. Appendix J.4, AR 18, p.4. One resident compared the air cargo facility to a "malignant, cancerous growth [that] is threatening our quality of life in Lakeland." AR 18, p. 177. In response, FAA told the concerned residents they would experience no significant impact and that no mitigation measures would be part of the project. AR 18, pp. 437-438.

The Phase II EA mentions in Appendix L that the Airport is supporting revised flight procedures that may alleviate some of the noise. AR 20. But, because these revised flight procedures are not part of the FONSI/ROD, there is no guarantee that the Airport or FAA will (1) develop the procedures, or (2) the procedures will provide meaningful relief to the residents.

## SUMMARY OF ARGUMENT

The expansion of the Amazon Air Cargo Facility at the Lakeland Linder International Airport (the "Airport") will result in a dramatically greater number of aircraft arriving and departing the Airport over residential sections of Lakeland, Florida and its surrounding communities, and significantly increased truck traffic in and around the Airport. FAA approved these actions in its October 29, 2021 "Finding of No Significant Impact and Record of Decision - Environmental Assessment for Phase II Air Cargo Facility Development at Lakeland Linder International Airport" (the "FONSI/ROD").

In contravention of National Environment Policy Act ("NEPA"), FAA arrived at its conclusion that the Project would not have any significant impact on the environment without analyzing the growth inducing and cumulative impacts of the expansion of the Amazon air cargo facility and the previous actions.

Because of FAA's actions, the increased noise and emission impact will be inflicted on Petitioners and Lakeland, Florida and its surrounding communities from the dramatically higher volume of air cargo flights and truck traffic resulting from the Project. These direct impacts will cause significant harm to the health, welfare and quality of life of Petitioners and the residents of Lakeland, already injured and harmed by the arrival of numerous air cargo flights throughout the day and night.

18

The Court should grant the Petition for Review, vacate the FAA's FONSI/ROD and order a new environmental assessment to properly evaluate and address the noise impact and environmental harm caused by the construction and expansion of the air cargo facility along with its necessary airport projects. This is warranted for the following reasons:

*One*, the FAA violated NEPA by segmenting review of the Airport's air cargo facility into several projects. These projects are part of a unified whole with functional interdependence, economic interdependence, common timing, and geographic proximity. Essentially, the new air cargo facility at the Airport is one project that FAA has divided into at least four segments that, collectively, may have significant adverse environmental impacts that should have been evaluated in a single NEPA environmental document.

*Two,* FAA's FONSI/ROD and implementation of the Project violated NEPA by failing to consider the cumulative impact of the Airport's and FAA's past actions, resulting in a false environmental baseline used to evaluate and assess the impact of the Project.

*Three*, the Phase II EA violated NEPA by failing to analyze *all* air quality impacts, and not simply those covered by the presumed to conform standard. The Phase II EA is devoid of any analysis or discussion of Hazardous Air Pollutants and is predicated on conclusory statements regarding its finding of no significant

19

air quality impacts.  In doing so, the Phase II EA and the FAA's FONSI/ROD fail to satisfy all air quality-related requirements of NEPA.

## ARGUMENT/CITATIONS OF AUTHORITY

### I. Petitioners Have Article III Standing to Bring this Petition for Review.

Petitioners have standing to sue because they have suffered an "injury in fact" brought about by the construction and expansion of the Amazon Air Cargo Facility at the Airport. This project is part of the FAA's and the City of Lakeland's development of an air cargo facility at the Airport (the "Project"), and has resulted in a dramatically greater number of large air cargo aircraft arriving and departing the Airport over residential sections of Lakeland, Florida, and its surrounding communities, and a significantly increased amount of truck traffic on the roads.

The Project is taking place where Petitioners live and work, and the noise impact and environmental harm inflicted on Petitioners by the Project has caused significant harm to the health, welfare and quality of life of the Petitioners. *See* AR 18, pp. 134-430.

To establish standing, Petitioners must show that (1) they have suffered an "injury in fact" that is concrete, particularized and actual or imminent; (2) the injury is fairly traceable to the challenged action; and (3) the injury will likely be redressed by a favorable decision. *Alabama v. United States Army Corps of Eng'rs*, 424 F.3d 1117, 1130 (11th Cir. 2005).

Here, Petitioners can satisfy all elements required to establish standing.

21

## A. Concrete and Particularized Actual Injury

Petitioners suffered actual injury that is concrete and particularized and that is fairly traceable to the Project and the increased flights and truck traffic resulting from the same.

Petitioners are individuals residing and owning property in Lakeland, Florida and Winter Haven, Florida. Declaration of John S. Lowman IV, Declaration of Holly Lowman, Declaration of Jabin Bonnett (together, the "Declarations") ¶ 1 (Declarations attached hereto as Exhibit "A"). When the FAA and the City of Lakeland implement the Project, such actions will harm the Petitioners in several ways. The Project will increase truck traffic and air traffic in the Petitioners' neighborhoods. This will increase the noise impact and air pollution, which will injure Petitioners' health and harm their quality of life. Declarations, ¶¶ 2, 4-5. Because FAA and the City have implemented "Phase I" of the development of the air cargo facility, Petitioners have experienced the harm caused by the air cargo facility.

Additionally, the increased air and truck traffic resulting from the Project will harm Petitioners' real property interests, as the noise impact and environmental damage resulting from the Project will reduce the property value of Petitioners' homes. Declaration of John S. Lowman, Declaration of Holly Lowman, ¶ 6.

22

Thus, Petitioners have suffered actual injury that is concrete and particularized and that is fairly traceable to the Project

## B. Petitioners' Injuries are Fairly Traceable to the Challenged Action

The harm to Petitioners' health, quality of life, and the diminished value of their property are all shown to have a causal connection to the Project and the challenged FONSI/ROD. Such injuries arise from the noise impact caused by the Project and the environmental harm resulting from the increased air and truck traffic because of the construction and expansion of the Amazon Air Cargo Facility.

To the extent that the FAA and the City of Lakeland decided in the FONSI/ROD to not take any action in connection with the Project to address the concerns and opposition to the Project voiced by the Petitioners and the residents of the impacted communities, the Petitioners could ultimately show implementing the Project was arbitrary and capricious or otherwise not in accordance with the law under 5 U.S.C. § 706(2)(A), (D). *See Utah v. Evans*, 536 U.S. 452, 464 (2002). Because the Petitioners can show success on the merits, they would likely be able show they would obtain relief that directly redresses the injuries suffered. *Id.*

23

### C. Petitioners Continue to Suffer Concrete Injuries Which Would be Redressed by the Court's Favorable Decision Vacating the FAA's FONSI/ROD for the Project

There is a causal connection between Petitioners' injuries described in the preceding paragraphs and the increased truck and flight traffic resulting from the Project. Therefore, should the Court vacate the FAA's FONSI/ROD, a new environmental assessment would be required that would properly evaluate and address the noise impact and environmental harm caused by the Project. The noise impact and environmental harm caused by the Project would be abated, and Petitioners would not continue to suffer the concrete injuries described.

## II.   Standard of Review for NEPA Claims

NEPA requires federal agencies to identify, evaluate, and disclose to the public the environmental impacts of proposed actions and to consider reasonable alternatives thereto. See 42 U.S.C. § 4332(2)(C), (E); 40 C.F.R. Parts 1500-1508 ("CEQ Guidelines"). Agencies must comply with NEPA *before* taking any action that could have an adverse environmental impact or limit the choice of reasonable alternatives. 40 C.F.R. § 1506.1.

Under NEPA, proposed actions with significant environmental effects must be evaluated in a detailed, comprehensive Environmental Impact Statement ("EIS"). 42 U.S.C. § 4332(2)(C). Actions with environmental effects that are less than significant (and actions whose effects are not known) are evaluated in a more

24

concise document known as an Environmental Assessment ("EA"). 42 U.S.C. §
4332(2)(E); 40 C.F.R. § 1501.3; 40 C.F.R. § 1508.9. In limited circumstances, an
agency may proceed without an EIS or an EA if its proposed action falls within a
defined Categorical Exclusion ("CATEX"). *See* 40 C.F.R. § 1508.4.

As articulated by the U.S. Supreme Court, "NEPA serves two purposes:
'First, 'it ensures that the agency, in reaching its decision, will have available, and
will carefully consider, detailed information concerning significant environmental
impacts.' Second, it 'guarantees that the relevant information will be made
available to the larger audience that may also play a role in both the decision-
making process and the implementation of that decision.'" *DOT v. Public Citizen*,
541 U.S. 752, 768 (2004). If a NEPA environmental document does not achieve
those two purposes, it is arbitrary and capricious and not in accordance of law. *Id.*

In *Public Citizen*, the U.S. Supreme Court emphasized the importance of the
informational purpose underlying NEPA, stating:

> The "informational role" of an EIS is to "giv[e] the public the
> assurance that the agency 'has indeed considered environmental
> concerns in its decision-making process,' *Baltimore Gas & Electric Co.*
> *[v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 97, 76 L.
> Ed. 2d 437, 103 S. Ct. 2246 (1983)], and, perhaps more significantly,
> provid[e] a springboard for public comment" in the agency decision-
> making process itself, *ibid.* The purpose here is to ensure that the
> "larger audience," *ibid.*, can provide input as necessary to the agency
> making the relevant decisions. See 40 CFR § 1500.1(c)
> (2003) ("NEPA's purpose is not to generate paperwork--even excellent
> paperwork--but to foster excellent action. The NEPA process is
> intended to help public officials make decisions that are based on

25

> understanding of environmental consequences, and take actions that protect, restore, and enhance the environment"); § 1502.1 ("The primary purpose of an environmental impact statement is to serve as an action-forcing device to insure that the policies and goals defined in the Act are infused into the ongoing programs and actions of the Federal Government").

*Public Citizen*, 541 U.S. at 768-69.

NEPA claims are generally subject to the arbitrary and capricious standard. *Sierra Club v. Martin*, 168 F.3d 1, 3 (11th Cir. 1999). The court "must overturn agency actions which do not scrupulously follow the regulations and procedures promulgated by the agency itself." *Fla. Wildlife Fed'n v. United States Army Corps of Eng'rs*, 401 F. Supp. 2d 1298, 1307 (S.D. Fla. 2005), *quoting Sierra Club v. Martin*, 168 F.3d 1, 4 (11th Cir. 1999) (citation omitted). The court is "duty-bound to overturn such actions." *Florida Wildlife Federation*, 401 F Supp.2nd at 1307, *citing Sierra Club v. Martin*, 168 F.3d 1, 4 (11th Cir. 1999), see also*, Simmons v. Block*, 782 F.2d 1545. 1550 (11th Cir. 1986).

## III.  FAA Failed to Evaluate the Impacts of Constructing the Air Cargo Facility in Accordance with its NEPA Obligations.

Although presented as "Phase II," the Environmental Assessment and FONSI/ROD to expand the Amazon air cargo facility at the Airport is just one part of a unified whole. Since the first phase – the construction of the 225,000 square foot facility – bore little relation to the facility examined in the Phase I EA or the subsequent "revalidation," it is properly included as part of the entire project. As

stated in the ground lease between the Airport and Amazon, the rehabilitation of

Runway 9-27 and upgrading the instrument landing system to CAT III should have

all been included as part of a single environmental document. As a result of FAA's

failures, the Phase II EA and FONSI/ROD are arbitrary and capricious because

they improperly segmented the Project and do not take the cumulative effects fully

into account.

### A. FAA Unlawfully Segmented its Review of Interconnected and Interdependent Projects Constructing an Air Cargo Facility at the Airport.

### 1. FAA May Not Artificially Break Up a Single Project to Avoid Assessing Environmental Impacts.

FAA violated NEPA by segmenting review of the City's air cargo facility

into several projects. These projects are part of a unified whole with functional

interdependence, economic interdependence, common timing, and geographic

proximity. The new air cargo facility at the Airport is one project that FAA has

divided into at least four segments that, collectively, may have significant adverse

environmental impacts and should have been evaluated in a single NEPA

environmental document.

NEPA is, "in large measure, an attempt by Congress to instill in the

environmental decision-making process a more comprehensive approach so that

long term and cumulative effects of small and unrelated decisions could be

recognized, evaluated and either avoided, mitigated, or accepted as the price to be

paid for the major federal action under consideration." *NRDC v. Callaway*, 524 F.2d 79, 88 (2d Cir. 1975). Generally, segmentation should be "avoided in order to insure that interrelated projects, the overall effect of which is environmentally significant, not be fractionalized into smaller, less significant actions." *Town of Huntington v. Marsh*, 859 F.2d 1134, 1142 (2d Cir. 1988). Without this rule, developers and agencies could "unreasonably restrict the scope of environmental review" (*Fund for Animals v. Clark*, 27 F. Supp. 2d 9, 16 (D.D.C. 1998)) and evade their responsibilities under NEPA by "artificially dividing a major federal action into smaller components, each without a 'significant' impact." *Coal. On Sensible Transp. v. Dole*, 826 F.2d 60, 68 (D.C. Cir. 1987). *See also* 40 C.F.R. § 1508.27(b)(7).

The justification for the rule against segmentation is obvious: it "prevent[s] agencies from dividing one project into multiple individual actions each of which individually has an insignificant environmental impact, but which collectively have a substantial impact." *NRDC v. Hodel*, 865 F.2d 288, 297 (D.C. Cir. 1988) (internal quotation marks omitted); *see also, Thomas v. Peterson*, 753 F.2d 754, 758 (9th Cir. 1985); *Save the Yaak Comm. v. Block*, 840 F.2d 714, 720 (9th Cir. 1988); *NRDC v. Callaway*, 524 F.2d 79, 87-90 (2d Cir. 1975); *Manatee County v. Gorsuch*, 554 F. Supp. 778, 793 (M.D. Fla. 1982). This rule ensures that an agency considers the full environmental impact of "connected, cumulative, or similar"

actions before they are undertaken, so it can "assess the true costs of an integrated project when it is best situated to evaluate 'different courses of action' and mitigate anticipated effects." *City of Boston Delegation v. FERC*, 897 F.3d 251-2 (D.C. Cir. 2018)

"An agency impermissibly 'segments' NEPA review when it divides connected, cumulative, or similar federal actions into separate projects and thereby fails to address the true scope and impact of the activities that should be under consideration." *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014); *see also Taxpayers Watchdog, Inc. v. Stanley*, 819 F.2d 294, 298 (D.C. Cir. 1987) (An agency cannot "segment" a project to avoid NEPA review "by dividing an overall plan into component parts, each involving action with less significant environmental effects"). An agency shall prepare a single environmental document for actions that are "connected," "cumulative," or "similar," such that their environmental effects are best considered in a single impact statement. *Am. Bird Conservancy, Inc. v. FCC*, 516 F.3d 1027, 1032 (D.C. Cir. 2008); 40 C.F.R. § 1508.25(a). "Actions are 'connected' or 'closely related' if they: '(i) Automatically trigger other actions which may require environmental impact statements; (ii) Cannot or will not proceed unless other actions are taken previously or simultaneously; [or] (iii) Are interdependent parts of a larger action and depend on the larger action for their justification.'" *Hammond v. Norton*, 370

F.Supp. 2d 226, 247 (D.D.C. 2005) (quoting 40 C.F.R. § 1508.25(a)(1). Similar actions' similarities provide a basis for evaluating their environmental consequences together, such as common timing or geography. *Id.* at 246; 40 C.F.R. § 1508.25(a)(3).

This prohibition against "segmentation" has also been incorporated into FAA's orders. FAA's primary environmental order, 1050.1F, states that "[c]onnected actions and other proposed actions or parts of proposed actions that are related to each other closely enough to be, in effect, a single course of action must be evaluated in the same EA or EIS. . .. A proposed action cannot be segmented by breaking it down into small component parts to attempt to reduce impacts." FAA Order 1050.1F, AR 203, § 2-3.2(bn); pp. 2-8. When an agency fails to use a single EA or EIS for connected actions, cumulative actions, or similar actions, it is arbitrary and capricious, and the decision must be vacated. See *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304 (D.C. Cir. 2014)]

### 2. The Project Is Part of a Single, Larger Project.

In this case, the larger project is bringing air cargo operations to the Airport through (1) the construction of a 600,000+ sq. ft. air cargo facility, that can accommodate nine large aircraft (Boeing 767-300 and 737-800 cargo aircraft), (2) strengthening the Airport's runway, (3) constructing a fuel farm, and (4) installing

CAT III ILS instrumentation. The Airport agreed to all of these projects as part of its contract with Amazon.

### a. The Phase II Project lacks independent utility.

A project lacks "independent utility" if it could not function or would not have been constructed absent of another project. *Wetlands Action Network v. U.S. Army Corps of Engineers*, 222 F.3d 1105, 1118 (9th Cir. 2000); *see also W.N.C. Alliance v. N.C. DOT,* 312 F.Supp. 2d 765, 774-775 (E.D.N.C. 2003). This Project lacks independent utility – it is the second phase of a two-phase project. Moreover, this Project is functionally interdependent not only with the first phase of construction of the air cargo facility, but also on the strengthening of the runway and the installation of CAT III ILS instrumentation. Without the other projects, constructing the air cargo facility is of limited value.

### b. The scope and alternatives for the Project were determined by factors other than the Project's purpose and need.

As shown by the alternatives analyses in the Phase II EA, there were no viable alternatives to the Project. Any alternatives were non-starters since the City according to its lease with Amazon was legally obligated to build the air cargo facility in the northwest quadrant of the Airport as an expansion of the air cargo facility where it had leased the property to Amazon.

FAA confirmed that there were no viable alternatives at a February 12, 2020, meeting. FAA was asked by AECOM, the contractor conducting the

environmental assessment, for its "recommendations on alternatives analysis since the nature of the project will make it difficult to come up with alternatives." February 19, 2020, email, AR 254, p.2. FAA "suggested that alternative locations on airport property be discussed but not studied in depth, rather, just mention why alternate locations do not meet the purpose and need." *Id.* The alternatives were simply "straw men" to satisfy the NEPA process, offering no reasonable alternative to the proposed project.

A project may be impermissibly segmented if it eliminates the "no build" alternative as a real possibility. *See W. N.C. Alliance v. N.C. DOT*, 312 F.Supp. 2d 765, 775 (N.C.E.D. 2003) (project that would exacerbate traffic due to existing bottleneck foreclosed no build option for future widening of bottleneck). The lease agreement between Amazon and the City made the expansion of the facility inevitable. Once the City and Amazon agreed on the leased terms and once Amazon requested that the air cargo facility be expanded the City was contractually obligated to allow the expansion of the air cargo facility. As Lakeland's City Attorney told the public at a hearing on whether the City should hold a referendum on the expansion of the air cargo facility "[t]here is a contractual obligation on the part of the city to cooperate with Amazon to get the approvals necessary to expand on that property." Sara-Megan Walsh, *Lakeland 'contractually obligated' to support Amazon expansion, city attorney says*,

32

Lakeland Ledger (June 7, 2021)

https://www.theledger.com/story/news/local/2021/06/07/lakeland-residents-call-

referendum-amazon-expansion-at-lal/7587501002/. This is borne out by the Phase

II EA.

Once Amazon requested to expand the air cargo facility, the "no build"

option was effectively foreclosed due to the contract between Amazon and the

City.

### c. Phase I and Phase II of the construction of the air cargo facility are "connected" actions.

Federal projects are "connected actions" if they "(i) Automatically trigger

other actions which may require environmental impact statements; (ii) Cannot or

will not proceed unless other actions are taken previously or simultaneously; (iii)

Are interdependent parts of a larger action and depend on the larger action for their

justification. 40 C.F.R. § 1508.25(a)(1). The Phase II portion of the Project will

necessarily not proceed unless Phase I of the air cargo facility is completed.

Likewise, the strengthening of Runway 9-27 and the installation of CAT III ILS

instrumentation are interdependent parts of the larger project. Without Amazon's

16,000+ aircraft operations a year every day of the year, it would be impossible for

FAA and the City to justify the runway strengthening (needed for Amazon's

Boeing 767's and 737's), or the installation of CAT III ILS instrumentation

(needed to conduct aircraft operations during inclement weather) at a general aviation airport with no commercial air service.

### d. Similar actions due to economic interdependence, common timing and geographic proximity all demonstrate the need to analyze the construction of the Amazon Air Cargo Facility as a single project.

Federal projects should be considered together if they are "similar actions." 40 C.F.R. § 1508.24(a)(3). Actions are considered "similar" if their similarities provide a basis for evaluating their environmental consequences together, such as common timing or geography. *Id.*

"Common timing" provides a basis for determining whether to evaluate the environmental consequences of two projects together. 40 C.F.R. § 1508.25(a)(3); *see also Fund for Animals v. Clark,* 27 F. Supp. 2d 8, 13 (D.D.C. 1998) ("if agency actions are similar in that they share common timing … such actions should be addressed in the same environmental document so as to assess adequately their combined impacts"). The Runway Rehabilitation project and the CAT III ILS instrumentation are coeval with the construction of the air cargo facility. All of these projects were specifically mentioned in the lease agreement between the City and Amazon. Had they not been conducted simultaneously, the Airport would be liable for substantial liquidated damages. The air cargo facility is essentially one construction project constructed in to two phases with a significant overlap of project planning and applications.

As the court pointed out in *Delaware Riverkeeper*,

> We emphasize here the importance we place on the timing of the four improvement projects. Separated by more time, the projects could have utility *independent* of the other projects. That is, the indications of the financial and functional interdependence of the projects might have been subsumed by the fact that Tennessee Gas constructed each project to be a standalone improvement for a substantial period of time. To take an obvious example, if the 300 Line Project had been placed into service a decade before FERC considered the Northeast Project application, the timing of the projects would support, rather than undermine, the conclusion that the projects had utility independent of each other. Here, however, the timing does not support the independence of the projects; rather, we are left with the fact that financially and functionally interdependent pipeline improvements were considered separately even though the there was no apparent logic to where one project began and the other ended.

*Del. Riverkeeper,* 753 F.3d at 318.

Likewise, in this matter, had "Phase II" been activated years after the Phase I EA, then there might have been a conclusion that the project had "independent utility." However, as in *Delaware Riverkeeper*, the timing does not support the independence of the projects. They are financially and functionally interdependent airport expansion projects considered separately even though there was no apparent logic to where one project began and the other ended.

Geographic proximity is another factor determining whether projects should be evaluated together. *See* 40 C.F.R. § 1508.25(a)(3); *Fund,* 27 F. Supp. 2d at 9

(citing § 1508.25 (a)(3) to require EIS for projects that "all [took] place in the same geographic area"). These projects were to take place at the Airport, with "Phase II" expansion taking place adjacent to the air cargo facility. Thus, issues like wetlands, run-off, stormwater, endangered species, etc. were raised in all of the segmented projects.

### 3. FAA and the City Were Required to Draft a Supplemental EA that Covered all of the Component Projects Connected to the Construction of the Air Cargo Facility at the Airport.

Because of the timing and the change in scope of the Project, FAA was required to draft a supplemental environmental assessment, not a separate environmental assessment. That supplemental EA would then "tier" the Runway Strengthening, Fuel Farm construction, and installation of the CAT III ILS instrumentation so that they would all be considered in the same environmental document. While NEPA itself does not directly address post-decision supplemental environmental impact statements, the Supreme Court has held that NEPA requires such supplementation. *Marsh v. Or. Nat. Res. Council*, 490 U.S. at 370-71; *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. at 72-73. "NEPA cases have generally required agencies to file environmental impact statements when the remaining governmental action would be environmentally 'significant.'" *Marsh*, 490 U.S. at 371, quoting *TVA v. Hill*, 437 U.S. 153, 188 n.34, (1978). The Supreme

Court found that its reading of NEPA was supported by the CEQ regulations,

which require a supplemental statement whenever:

> (i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or

> (ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.
> 40 C.F.R. § 1502.9(c)(1);

*Marsh*, 490 U.S. at 372.

FAA memorialized these provisions in its orders. FAA Order 5050.4B, §

1402 states:

> b.        Circumstances requiring a supplement. Text at 40 CFR 1502.9(c) discusses the need for supplementing EISs. Based on that regulation, the following situations require FAA to supplement EAs and EISs.

> (1)        The airport sponsor or FAA makes substantial changes in the proposed action that could affect the action's environmental effects. or

> (2)        Significant new changes, circumstances or information relevant to the proposed action, its affected environment, or its environmental impacts becomes available.

See also FAA Order 1050.1F, § 9-3, p. 9-3.

As to the first prong, an agency makes a "substantial change" to a proposed action if the change "presents a seriously different picture of the environmental impact" of the agency's action. *In re Operation of Mo. River Sys. Litig.,* 516 F.3d 688, 693 (8th Cir. 2008); *Ark. Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 431 F.3d 1096, 1102 (8th Cir. 2005). An agency must consider both context and intensity to determine whether a change is "significant." 40 C.F.R. § 1508.27. In this matter, FAA and the City proposed to expand the air cargo facility by 392,000 sq. ft. even before Phase I of the air cargo facility had begun operations, which substantially increased air cargo aircraft operations, impacted wetlands, impacted air quality, and caused additional truck traffic in and around Lakeland.

Since in this case, there remains "major Federal actio[n]" to occur – the construction of Phase II - and the change in the size of the air cargo facility - will "affec[t] the quality of the human environment" a supplemental EIS must be prepared. *Marsh*, 490 U.S. at 373-74. *See also Norton, 542 U.S. at 72-73; Sierra Club v. U.S. Army Corps of Eng'rs.*, 295 F.3d 1209, 1215-16 (11th Cir. 2002); *Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 560 (9th Cir. 2006).

### B. FAA Violated NEPA by Failing to Take into Consideration the Cumulative Impact of Its Past Actions Thereby Creating a False Baseline.

NEPA requires "agencies to consider the cumulative impacts of proposed actions." *NRDC v. Hodel*, 865 F.2d 288, 297 (D.C. Cir. 1988). *See also TOMAC v. Norton*, 433 F.3d 852, 864 (D.C. Cir. 2006). This means an agency must analyze the impact of a proposed project, given that project's interaction with the effects of "past, current, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7. "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id*. FAA Order 1050.1F essentially parrots the NEPA regulations, stating that "[c]umulative impacts are those that result from the *incremental impact* of the action when added to other *past*, present, and reasonably foreseeable future actions, whether Federal or non-Federal." FAA Order 1050.1F, § 4-2(d)(3) (emphasis added).

To that end, "[a] meaningful cumulative impact analysis must identify (1) the area in which the effects of the proposed project will be felt; (2) the impacts that are expected in that area from the proposed project; (3) other actions--past, present, and proposed, and reasonably foreseeable--that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these other actions; and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate." *Grand Canyon Trust v. FAA*, 290 F.3d 339,

345 (D.C. Cir. 2002). NEPA requires such an analysis because "[e]ven a slight increase in adverse conditions . . . may sometimes threaten harm that is significant . . . may represent the straw that breaks the back of the environmental camel." *Id*. at 343. Because FAA failed to take into account the incremental changes in the environmental impacts from the Phase I EA, to the "revalidation" to Phase II, (Phase II EA, AR 7, pp. 5-42 – 5-51) it failed to comply with its obligations under NEPA and therefore the FONSI/ROD is arbitrary and capricious and not in accordance with law.

### 1. FAA's cumulative impact analysis in the Phase II EA is inadequate and fails to comply with NEPA.

NEPA's cumulative impact analysis requirement is not satisfied where the "analysis" merely announces there may be risks or impacts but does not provide the kind of information about those risks or impacts that would be "useful to a decisionmaker in deciding whether, or how, to alter the program to lessen cumulative environmental impacts." *Hodel*, 865 F.2d at 299 ("perfunctory references" do not constitute "analysis"). A cumulative impact section that merely "recites the history of [project] development" and then offers the "conclusory statement" that "the cumulative direct impacts have been minimal" does not satisfy NEPA requirements. *FOE v. United States Army Corps of Eng'rs*, 109 F. Supp. 2d 30, 42 (D.D.C. 2000) (citing *Hodel*, 865 F.2d at 298). More generally, an agency must provide a reasoned explanation to support its assertions and conclusions;

40

otherwise, its decision is arbitrary and capricious. *Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 6 (D.C. Cir. 2006) ("Alpharma").

The Phase II EA does not provide information about the impact of noise that would be useful to the public. It merely concludes that "[b]ased on the cumulative projects any future mitigation that may be required for individual projects, significant cumulative effects would not occur when the effects from the FAA Proposed Action and Proposed Development Project are considered in addition to the effects of other past, present, and reasonably foreseeable actions in the area. No significant cumulative noise impacts are expected to occur." Phase II EA, AR 7, p. 5-49. However, missing from this conclusion is the area in which the effects of the proposed project will be felt, the impacts expected from the proposed projects, and the impacts from past projects. As indicated by the public comments, the impacts from the beginning of air cargo air traffic at the Airport have been felt well beyond the 65 DNL contour. Yet, FAA has failed to analyze the impact on residents even though required to by NEPA.

FAA was well aware that aircraft noise would have an impact well beyond the 65 DNL contour. The FAA's own study, the NES, shows that much of the population is "highly annoyed" by aircraft noise at levels far below 65 DNL. FAA knew this when it undertook the Phase II EA, yet there is no mention, let alone analysis, of how the Project will impact people beyond the 65 DNL. Again, the

41

comments that FAA received indicate that the residents were already "highly annoyed," and that adding more air cargo flights would only increase that annoyance. By ignoring the NES, the FAA's Phase II EA does not measure up to the "high quality" and "accurate scientific analysis" that NEPA's implementing regulations demand of environmental information provided by agencies. 40 C.F.R. § 1500.1; *see also*, *350 Mont. v. Haaland*, 9 F. 4th 1158, (9th Cir. 2022). Since FAA knows that people are "highly annoyed" at levels well below 65 DNL, it must provide the information that is known. *See Mont.*, 29 F.4th at 1176. *Sierra Club v. Bosworth*, 510 F.3d 1016 (9th Cir. 2007) (NEPA regulations demand information of "high quality" and of professional integrity).

### 2. FAA violated NEPA by failing to consider the cumulative impact of its past actions.

The goal of cumulative impact analysis is "to highlight any environmental degradation that might occur if the minor effects of multiple actions accumulate over time," and thus, avoid "'the tyranny of small decisions.'" See *Habitat Educ. Ctr., Inc. v. U.S. Forest Serv.*, 593 F. Supp. 2d 1019, 1029 (E.D. Wis. Jan. 2009) (quoting *Council on Environmental Quality, Considering Cumulative Effects*

*Under the National Environmental Policy Act* (January 1997) (CEQ Handbook).[6]
Courts have found an agency's cumulative impacts analysis to be insufficient under
NEPA where an agency "failed to conduct any inquiry into the existence of present
effect[s] of past actions," *Ohio Valley Envtl. Coalition v. Hurst*, 604 F. Supp. 2d
860, 886 (S.D.W.Va. 2009), or where the agency calculated the incremental impact
of an action but failed to consider the total harm when that impact is aggregated
with the impacts of other actions, see *Grand Canyon Trust v. FAA*, 290 F.3d 339,
345-47 (D.C. Cir. 2002). The Middle District of Florida held in *St. Johns
Riverkeeper, Inc. v. United States Army Corps of Eng'rs*, 462 F. Supp.3d 1256
(M.D. Fla. 2020) that "[t]he goal of the [cumulative impact] analysis is 'to
highlight any environmental degradation that might occur if the minor effects of
multiple actions accumulate over time,' and thus, avoid 'the tyranny of small
decisions.'" (*Citing Habitat Educ. Ctr. v. United States Forest Serv.*, 593 F. Supp.
2d 1019, 1029 (E.D. Wis. 2009). This is what happened in the Phase II EA.

    In this case, FAA rolled out several interdependent and connected projects
without any of the analysis required by NEPA because they were given

_____

[6] Council on Environmental Quality, *Considering Cumulative Effects Under the
National Environmental Policy Act* (January 1997)
https://www.lb7.uscourts.gov/documents/15-801URL2NEPAreport.pdf  (last
accessed 08/01/2022)

"categorical exclusions." Runway strengthening and the installation of CAT III

ILS instrumentation[7]  both were given categorical exclusions. More importantly is

the situation with the Air Cargo Facility itself. Originally conceived in 2016 as a

small part of a project to bring MRO and air cargo facilities to Lakeland, the

"Phase I EA" only looked at induced impacts of additional cargo flights of 820

aircraft operations a year, or one air cargo flight per day (and an additional flight a

day for 45 days out of the year).

However, before the MRO hangars or the air cargo facility could be built,

the City apparently began negotiations with Amazon. Because of those

negotiations, the Airport indicated that they would reach 5,400 air cargo operations

a year within one year of opening the air cargo facility. FAA claims that a new

noise analysis was done, but there is no documentation or analysis provided that

shows that FAA's decision was reasonable or supported by documentation. The

only exhibit provided is an updated noise contour map, no further analysis was

done. In addition, the "updated noise contour maps" did not show the change from

no cargo flights to 5,400 operations. AR 25, pp.3, 13-14. Instead, it showed the

---

[7] Indeed, the Airport had just received permission to upgrade its ILS
instrumentation to CAT II just before seeking federal funding for the installation of
CAT III instrumentation. See CAT II Upgrade CATEX, AR 91.

change from the 2016 Phase I EA noise contour map based 820 operations to 5,400 operations. *Id*.

In the Phase II EA, FAA brushes off the requirement to consider the present effects of past actions by stating that "[n]oise generated by the operation of the Phase I development are included and accounted for in the EA's No-Action Alternative." Phase II EA, p.5-49 (AR 7, p. 160). The Phase II EA describes the "no-action alternative" as being the operations as they would exist in 2022 with the 225,000 sq. ft. facility operating with 7,200 operations per year. Phase II EA, p. 5-18 (AR 7, p. 116). The no-action alternative does not include the impact of FAA's prior actions or the cumulative effect of those past actions.  FAA then compares the modeled noise impact of the proposed action with the modeled noise impact of the "no-action alternative" to determine if there is a "significant impact." *Id.*

But FAA's comparison does not consider the aggregate of the incremental changes between each of the FAA's past actions. 40 C.F.R. § 1508.7 directs an agency to consider that incremental impact "when added to other past, present, and reasonably foreseeable future actions regardless of what agency … or person undertakes such other actions." 40 C.F.R. § 1508.7; see also, *Grand Canyon Trust*, 290 F.3d at 346. The introduction of air cargo aircraft at the Airport has created a situation where residents in the areas surrounding the Airport, including petitioners, experienced no air cargo flights to 13 flights per day over the space of

45

a year or two. And now FAA wants to double that number without assessing the damage it has already done. NEPA requires that FAA analyze these cumulative effects of its past actions.

FAA's public documents and those in the Administrative Record shed no light on the cumulative effects of past actions. As mentioned above, Chapter 5 of the Phase II EA only offers a conclusory statement that ""[n]oise generated by the operation of the Phase I development are included and accounted for in the EA's "No-Action Alternative." Phase II EA, p.5-49 (AR 7, p. 160). Chapter 4 of the Final EA, however, provides no additional information about how an environmental baseline of existing noise over the Affected Environment reflect the cumulative change of past actions. Phase II EA, pp. 4-20-4-24 (AR 7, pp. 86-89).

Yet, *Considering Cumulative Effects* states that "the baseline condition of the resource of concern should include a description of how conditions have changed over time …" *Considering Cumulative Impacts*, p.41. FAA's Order 5050.4B picks this up, requiring FAA "[t]o complete the EA's cumulative analysis, the Affected Environment section should include critical background information of past, present, and reasonably foreseeable future actions." 5050.4B, ¶ 705(e)(1), p. 8. Because there is no "critical background information" of past actions in the Affected Environment section of the Final EA, Phase II EA, pp. 4-1 – 4-31 (AR 7, pp. 67-98), FAA's Environmental Assessment is arbitrary and capricious.

### 3. The "Affected Environment" in the Phase II EA Is Unduly Restrictive and is in Violation of NEPA and FAA Orders.

The "affected environment" in the Phase II EA is too restrictive. In an effort to limit the discussion of noise impacts, FAA limited the EA's "affected environment" to the "area within the composite 65 decibel (dB) day-night average sound level (DNL 65 dB) and higher noise contour of the Proposed Development Project and retained alternatives." Phase II EA, p.4-1 (AR 7, p. 67). This is contrary to FAA Order 1050.1F, which described the "affected environment" as "[t]he study area for noise . . . with the potential to be impacted by noise from the proposed project." FAA Order 1050.1F § B-1.3, p. B-2; see also 40 C.F.R. § 150.15. Significantly, 1050.1F states that it is the "potential to be impacted by noise" that determines the boundaries of the affected environment. It is not the potential to be *significantly* impacted by noise.

Knowing that the FAA's NES concludes that people are "highly annoyed" at levels far below 65 DNL, coupled with the over 200 comments from residents in the community complaining about the increase in noise from the existing air cargo operations (AR 18, p. 436), FAA knew that the Phase II expansion would have impacts on noise levels far beyond the boundaries of the 65 DNL contours. Both 1050.1F and 40 C.F.R. § 1502.15 required FAA to analyze the noise impacts beyond the 65 DNL contour. Because of FAA's failure, the noise analysis in the Phase II EA is useless for the residents in the communities impacted by the

47

increase in noise resulting from the doubling of air cargo operations at the Airport due to the Project.

### 4. FAA's Use of "No Action" Conditions for Its Noise Baseline Fails to Capture the Impacts of Noise from FAA's Actions Prior to the Project.

FAA calculates whether a project will have a significant impact on the environment through the *change* in noise created by the project. Phase II EA, p. 5-30 (AR 7, p. 137). When considering the cumulative impact of an airport project involving an increase in aircraft operations, FAA must look at the aggregate change in noise from prior actions. This is not captured in FAA's "no-action" alternative. Phase II EA, p. 3-2 (AR 7, p. 52).

Using the no-action alternative as a baseline does not satisfy the agency's obligation under NEPA to analyze cumulative effects of past actions. As explained in *Considering Cumulative Effects,* "[t]he concept of a baseline against which to compare predictions of the effects of the proposed action and reasonable alternatives is critical to the NEPA process. The no-action alternative is an effective construct for this purpose, *but its characterization is often inadequate for analyzing cumulative effects*." *Considering Cumulative Effects*, p. 41(emphasis added). Instead of relying on the no-action alternative to analyze cumulative effects, CEQ states that "more often, the analyst must review the history of that resource and evaluate whether past degradation may place it near such a

threshold." *Id.* This was not done for the Phase II EA. There is no review of how

what was once perceived to be a quiet airspace with no commercial air cargo

traffic has become filled with aircraft noise and emissions, and that noise will

double with the expansion of the air cargo facility. Phase II EA, Appendix J.4, AR

18, pp. 014, 019, 020, 47, 52, 56, 57, 61, 63, 69, 70, 71, 78, 83, 85, 96, 119, 121,

128, 129, 139, 140, 141, 147, 153, 162, 165, 167, and 174.

The EPA explained this requirement in its guidance document *Consideration*

*of Cumulative Impacts in EPA Review of NEPA Documents*.[8] EPA states that "the

current condition typically may not adequately represent how actions have

impacted resources in the past … Designating existing environmental conditions as

a benchmark may focus the environmental impact assessment too narrowly,

overlooking cumulative impacts of past … actions …" *Consideration*, p.14.[9]

FAA's Phase II EA in the Project offers a case-in-point as to why an

"existing conditions" baseline overlooks the cumulative impacts of past actions.

The Project presents a classic "frog-in-the-pan" scenario. When including an air

_____

[8] Environmental Protection Agency, *Consideration of Cumulative Effects in EPA Review of NEPA Documents* https://www.epa.gov/sites/default/files/2014-08/documents/cumulative.pdf  (last accessed 08/01/2022)

[9] . FAA mentions this document in FAA's environmental order 1050.1F, see ¶ 7-1.1(f)(5).

cargo facility at the Airport was first considered by the FAA in 2016, the size of the facility dictated that it would induce relatively few aircraft operations (1 daily flight, with 2 daily flights for 45 days), so the "Phase I EA" concluded there would be no significant impact. The pan with the frog was set on the stove. In 2018, the Phase I EA was "revalidated," indicating that while the secret prospective tenant said that aircraft operations would be 5,840 by 2023, the increase from one daily flight to eight daily flights would also not create a significant impact, the heat on the stove was turned up more.

Now, in the Phase II EA, FAA states that the "No Action" alternative sends 7,300 aircraft operations over the heads of Lakeland residents (Phase II EA, p. 5-1, AR 7, p. 99), which it now uses as the no-action alternative. With 10 daily flights over their heads, the water in the pan is already near the boiling point.[10] FAA now argues that it should be allowed to examine only the impact of turning up the heat just a little more on those affected, i.e., the change from 7,300 to 13,140. *Id.* Instead, had FAA followed FAA Orders, CEQ and EPA guidance, FAA's "cumulative effects" analysis would have examined the incremental impact of the

---

[10] It has been reported that 7,300 aircraft operations is too low. Lakeland Airport has since reported that Amazon runs 13 daily flights a day (9,400 aircraft operations per year). Paul Nutcher, *Lakeland Linder is the 4th busiest cargo airport in Florida and getting busier, director says*, Lakeland Ledger (June 13, 2022).

change in noise from the time before FAA first put the pan on the stove (2015), when there were no air cargo flights, and not from the point just before the boiling point is reached.

FAA has in its NEPA toolbox a solution to this problem, which it chose not to use. As EPA explained,

> [a]nother approach for describing the environmental condition is to use an environmental reference point that would be incorporated into the environmental consequences and affected environment sections of the document. In analyzing environmental impacts, this environmental reference point would not necessarily be an alternative. Instead, it would serve as a benchmark in assessing the environmental impacts associated with each of the alternatives. Specifically, the analysis would evaluate the degree of degradation from the environmental reference point (i.e., natural ecosystem condition) that has resulted from past actions. Then the relative difference among alternatives would be determined for not only changes compared to the existing condition but also changes critical to maintaining or restoring the desired, sustainable condition.

*Considering*, p.39.

FAA's cumulative effects analysis in the Phase II EA is precisely the "tyranny of small decisions" that NEPA was trying to avoid by requiring federal agencies to consider the cumulative effects of past actions. Through these incremental changes the noise levels over Lakeland increased in steps. FAA claimed that at each step there was no "significant" increase. But FAA has left unexamined the change in noise impact between 2015 (when there were no air cargo aircraft operations) and 2027 (when the air cargo facility will run at

51

capacity). This failure violates NEPA's cumulative effects requirement rendering the FAA's decision arbitrary and capricious.

## IV.    The FAA Violated NEPA by Failing to Analyze All Air Quality Impacts

The Clean Air Act specifically addresses the need for federal projects to address general conformity, which concerns "criteria pollutants." 42 U.S.C. 7506(c). NEPA and its regulations, however, require more than a conformity analysis with air quality. NEPA requires a federal agency, such as FAA, to broadly consider whether the action has "[e]ffects that would violate Federal, State, Tribal, or local law protecting the environment." 40 C.F.R. § 1501.3(b)(2)(iv).  FAA Order 1050.1F states that "an impact on air quality *or* Federal, state, tribal or local air quality standards under the Clean Air Act" is an extraordinary circumstance necessitating further environmental review. FAA Order 1050.1F § 5-2(b)(8). Likewise, FAA Order 5050.1B points out that "NEPA is more rigorous in that it may require detailed analysis where it is not needed under the Clean Air Act's (CAA) general conformity provisions." FAA Order 5050.4B, Chap. 1, § 1a. Thus, the Phase II EA also violated NEPA by failing to analyze *all* air quality impacts, and not simply those covered by General Conformity or the presumed to conform standard.

The Phase II EA blithely states that because the Airport is an "Attainment Area" for the criteria air pollutants, it need not perform any additional analysis.

"Because the Proposed Development Project is not expected to generate operational or construction-related emissions that would exceed one or more NAAQS, or would not increase the frequency or severity of any such existing condition, the Proposed Development Project would not exceed impact threshold identified in FAA Order 1050.1F that would indicate a significant impact." Phase II EA, p.5-4 (AR 7, p. 102). However, the significance thresholds mentioned in 1050.1F were promulgated specifically to satisfy FAA obligations under the Clean Air Act, *not* to satisfy all air quality-related requirements of NEPA. 1050.1F § 5-2(b)(8).

Since the purpose of an environmental assessment is to address and provide information regarding all environmental impacts, not just providing a showing that there will be no significant impact, the Phase II EA falls short. As this Court pointed out in *Black Warrior Riverkeeper, Inc. v. U.S Army Corps of Eng'rs*, 833 F.3d 1274, 1278 (11ᵗʰ Cir. 2016) NEPA informs agency decisionmakers of the environmental effects of proposed federal actions and ensures that relevant information is provided to members of the public so they may also play a role in both the decision-making process and the implementation of that decision. The purpose of an EA is to provide information about the environmental impacts of a federal project, not just to determine if there will be significant effects.

Toward that end, FAA has published the *Aviation Emissions and Air Quality Handbook*, AR 200, a handbook whose purpose is:

> To provide guidance, procedures, and methodologies appropriate for use in carrying out air quality assessments prepared in association with FAA-supported projects/actions;
>
> To help ensure that these air quality assessments meet the requirements of the National Environmental Policy Act (NEPA), the federal Clean Air Act (CAA), and other relevant laws and regulations.

AR 200, p.20.

Noticeably absent from the Phase II EA is any discussion of Hazardous Air Pollutants. Hazardous air pollutants (HAPs) are pollutants for which there are no National Ambient Air Quality Standards (NAAQS) but are still regulated under the federal Clean Air Act because of their potentially adverse effects on human health and the environment. 42 U.S.C. § 7412. These pollutants, such as formaldehyde, acetaldehyde, benzene, toluene, acrolein, 1,3-butadiene, xylene, lead, naphthalene and propionaldehyde, are present in the exhaust of aircraft, Ground Support Equipment (GSE), Auxiliary Power Units (APU), motor vehicle engines, boilers, fuel facilities, and other stationary sources at airports. *Aviation Emissions Handbook*, p. 44 (AR 200, p. 53). Many of these sources are included in Phase II.

Since 2003, FAA has been providing guidance to preparers of environmental assessments and environmental impact statements on how to address hazardous air

54

pollutants. In 2003 the FAA issued *Select Resource Material and Annotated Bibliography on the Topic of Hazardous Air Pollutants (HAPs) Associated With Aircraft, Airports and Aviation. Aviation Emissions Handbook*, p.45, AR 200, p. 54).[11] Among the key findings from this initial publication was the need for a more unified approach and technical guidelines for evaluating HAPs emissions for aviation-related sources. Twice in 2009 FAA issued guidance related to hazardous air pollutants. First, in May 2009, EPA and FAA jointly published the *Recommended Best Practice for Quantifying Speciated Organic Gas Emissions from Aircraft Equipped with Turbofan, Turbojet, and Turboprop Engines*[12] document. This document contained organic gas speciation profiles and best practices for hazardous air pollutant emission inventories of aircraft equipped with turbofan, turbojet, and turboprop engines fueled with kerosene-based jet-A fuel. *Id.* Also, in September 2009, FAA issued its *Guidance for Quantifying Speciated*

---

[11] FAA, *Select Resource Material and Annotated Bibliography on the Topic of Hazardous Air Pollutants (HAPs) Associated With Aircraft, Airports and Aviation*, Technical Directive Memorandum D01-010, July 1, 2003, https://www.faa.gov/regulations_policies/policy_guidance/envir_policy/media/HAPs_rpt.pdf

[12] FAA and EPA, *Recommended Best Practice for Quantifying Speciated Organic Gas Emissions from Aircraft Equipped with Turbofan, Turbojet, and Turboprop Engines*, May 2009 [EPA-420-R-09-0901]. https://www.faa.gov/regulations_policies/policy_guidance/envir_policy/media/FAA-EPA_RBP_Speciated%20OG_Aircraft_052709.pdf

*Organic Emissions from Airport Sources*.[13] This document offers guidance on how to prepare HAPs inventories supporting EAs and EISs prepared by, or on behalf of, the FAA under NEPA. *Aviation Emissions Handbook*, p.46 (AR 200, p. 55). When a HAPs inventory is prepared, the inventory must be prepared following this guidance and using EDMS/AEDT. *Id.* Included in the guidance is a flow chart to determine when a HAPs emission inventory must be prepared. *Id.*; *see also Guidance for Quantifying*, Figure 3, p.14.

---

[13] FAA, *Guidance for Quantifying Speciated Organic Gas Emissions from Airport Sources*, Version 1, September 2, 2009, http://www.faa.gov/regulations_policies/policy_guidance/envir_policy/media/Guidance%20for%20Quantifying%20Speciated%20Organic%20Gas%20Emissions%20from%20Airport%20Sources.pdf

**Figure 3**
**Determining if an Emissions Inventory is Warranted**



*Speciated Organic Gas Emissions Guidance*, figure 3, p.14.

Following the above flow chart, a HAPs inventory should have been created in this matter.

| Flow Chart Question | Answer Regarding Phase II EA |
| --- | --- |
| Is Project/Action being assessed as an EIS or EA? | EA. |
| Is this a Major Project/Action? | Yes |
| Is a Criteria Air Pollutant Emissions Inventory Being Prepared? | Yes. See Phase II EA, p. 5-2 (Construction Emissions) and p. 5-3 (Operational Emissions) in 2022 and 2027). |
| Conclusion | Compute HAP Emission Inventory for Each Alternative (but only report project-related HAPs in NEPA documentation). |

Because the Project will increase the number of air cargo flights from zero to 16,000+, the impact of the emissions from the aircraft flying above them must be analyzed. Coupled with the many complaints to FAA about emissions from aircraft in the public comments (see, e.g., AR 18, pp. 187, 384, 416, 460, 462, 466, 469, 470, 475, 485, 486, 516, 522, 525, 531, 533, and 541), this makes it unreasonable, arbitrary and capricious for FAA to rely exclusively on the presumed to conform list as a basis for compliance with NEPA. Without further analysis of the air quality impacts, the Phase II EA is arbitrary and capricious.

## CONCLUSION

As set forth above, the FAA's decision in its October 29, 2021 "Finding of No Significant Impact and Record of Decision - Environmental Assessment for Phase II Air Cargo Facility Development at Lakeland Linder International Airport" failed to adequately consider and analyze the noise impact, air quality impact and environmental harm presented by the Project, as required under NEPA.  As a result, the Phase II EA and FONSI/ROD are arbitrary and capricious and should be overturned.  Petitioners respectfully request the Court to:

*One,* vacate and remand for adequate review and analysis under NEPA the FAA's October 29, 2021 "Finding of No Significant Impact and Record of Decision - Environmental Assessment for Phase II Air Cargo Facility Development at Lakeland Linder International Airport." Vacatur of FAA's action is appropriate. *See, New York v. Nuclear Regulatory Comm'n,* 681 F. 3d 471, 473 (D.C. Cir. 2012) (vacating NRC's rulemaking because of deficient NEPA environmental review). Under *Allied-Signal v. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993), a decision to vacate "depends on the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed.") (citation and quotation marks omitted). Both *Allied-Signal* factors support vacating the FAA's FONSI/ROD. First, as set forth in Petitioners'

Opening Brief, the FAA's failure to adequately assess the noise and air quality impacts of the Phase II Air Cargo Facility Development at Lakeland Linder International Airport led to an action that has substantial noise and air quality impacts on Petitioners, Lakeland and its surrounding communities. Second, vacatur would not disrupt FAA's operations at the Airport, as the construction and expansion of the Air Cargo Facility pursuant to the Phase II Air Cargo Facility Development Project is still in its preliminary stages and FAA operations will be able to continue in their present state while the FONSI/ROD is remanded for appropriate review under NEPA.

*Two,* require FAA to adequately consider the noise and air quality impacts of all federal projects connected to the construction and expansion of the air cargo facility at Lakeland Linder Airport under NEPA.

Dated: August 1, 2022

STEVEN M. TABER
DANIEL P. YEOMANS
Leech Tishman Fuscaldo & Lampl, Inc.
200 South Los Robles Ave., Suite 300
Pasadena, California 91101
Telephone: (626) 796-4000
Facsimile: (626) 795-6321
staber@leechtishman.com
dyeomans@leechtishman.com

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitation set forth in Fed.R.App. 32(a)(7)(B) because it contains 12,395 words. I further certify that this Petition complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

Dated: August 1, 2022            LEECH TISHMAN FUSCALDO & LAMPL

By: _Steven M. Taber_

Steven M. Taber

*Attorneys for John S. Lowman IV, Holly Lowman, Rick Brian Stevens, Maryann Stevens, and Jabin Bonnett*

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system on August 1, 2022. I certify that all participants are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: August 1, 2022        LEECH TISHMAN FUSCALDO & LAMPL

By: _Steven M. Taber_

Steven M. Taber
*Attorneys for John S. Lowman IV, Holly Lowman, Rick Brian Stevens, Maryann Stevens, and Jabin Bonnett*