[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-14476

_____

JOHN S. LOWMAN, IV,
HOLLY LOWMAN,
RICK BRIAN STEVENS,
MARYANNE STEVENS,
JABIN BONNETT,

Petitioners,

*versus*

FEDERAL AVIATION ADMINISTRATION,
FEDERAL AVIATION ADMINISTRATOR,

Respondents,

CITY OF LAKELAND, FLORIDA,

                                                    Intervenor-Respondent.

_____

Petition for Review of a Decision of the
Federal Aviation Administration
Agency No. FAA: FONSI/ROD

_____

Before ROSENBAUM, BRANCH, and BRASHER, Circuit Judges.

BRANCH, Circuit Judge:

The City of Lakeland, Florida, ("City") owns and operates the Lakeland Linder International Airport ("Airport"). To improve the Airport's financial performance and boost economic development, the City invested in projects—approved by the Federal Aviation Administration ("FAA")—to enhance the Airport. The City's plan worked; it landed a deal to lease the Airport's newly-constructed air cargo area to Amazon.com Services, Inc. ("Amazon").

Then, to further accommodate Amazon, the City sought FAA approval of a second set of expansion projects ("Phase II"). The FAA reviewed an Environmental Assessment and issued a Finding of No Significant Impact/Record of Decision, which greenlighted Phase II.

Petitioners, a group of five individuals, filed this petition for review, claiming that the FAA violated the National Environmental Policy Act ("NEPA") during its Phase II approval process. Petitioners assert that the FAA violated NEPA by (1) segmenting its review of a single Airport development project into multiple, smaller projects to make the project's environmental effect appear less significant, (2) failing to consider the project's cumulative effects, and (3) failing to analyze all air quality impacts. The FAA responds that, as an initial matter, Petitioners cannot bring this petition for review because they lack standing and did not exhaust their administrative remedies. Alternatively, the FAA contends that it did not violate NEPA, and the petition for review should be denied.

After careful review, and with the benefit of oral argument, we conclude that Petitioners have standing and did not fail to exhaust their administrative remedies. Thus, we must consider the merits of their petition for review. Petitioners, however, fall short on the merits because it is clear that the FAA satisfied NEPA's requirements. Accordingly, we deny the petition for review.

## I.     Background

### A. NEPA Overview

We start with an overview of NEPA to provide context for Petitioners' arguments.

NEPA, one of the nation's first large-scale environmental statutes, was passed in part to "declare a national policy which will encourage productive and enjoyable harmony between man and

his environment," "prevent or eliminate damage to the environment," and "enrich the understanding of the ecological systems and natural resources important to the Nation." 42 U.S.C. § 4321 (quotation omitted). In broad strokes, NEPA requires federal agencies to assess the environmental effects of certain proposed actions. *Id*. § 4332. And, to ensure that NEPA was implemented properly, the statute created the Council on Environmental Quality ("CEQ"). *Id*. § 4344.

NEPA is not results-oriented; rather, its procedural mechanisms were designed such that agencies must "follow a certain [decision-making] process" when evaluating proposed actions. *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1361 (11th Cir. 2008). CEQ's regulations direct federal agencies to evaluate different proposed actions through different processes.[1]

First, for proposed actions "likely to have significant effects" on the "quality of the human environment," an agency must prepare an Environmental Impact Statement ("EIS"). 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.3(a)(3). EISs "shall provide full and fair discussion of significant environmental impacts and shall

---

[1] While the FAA was reviewing Phase II, CEQ amended its NEPA regulations. *See* Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Acy, 85 Fed. Reg. 43304-01 (July 16, 2020). Under 40 C.F.R. § 1506.13, the amended regulations apply to NEPA processes initiated "after September 14, 2020." For ongoing reviews, agencies have discretion to apply the new regulations or those previously in effect. Here, the FAA "decided to apply the regulations in effect" in February 2020 when it initiated the NEPA process in this case.

inform decision makers and the public of reasonable alternatives that would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1. EISs must go through a public comment period. *See, e.g.*, *id.* § 1506.11(d) ("[A]gencies shall allow at least 45 days for comments on draft [EISs].").

Second, for proposed actions that are "not likely to have significant effects or [for which] the significance of the effects is unknown," an Environmental Assessment ("EA") should be prepared rather than an EIS. *Id.* § 1501.5. EAs essentially serve an intermediary function—requiring that the agency "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an [EIS] or a finding of no significant impact [("FONSI")] . . . ." *Id.* § 1501.5(c)(1). In other words, EAs inform an agency as to whether a more in-depth analysis is needed because the proposed action will have significant effects—leading to an EIS—or whether no further study is needed because the proposed action will not have significant effects—leading to a FONSI.[2] *Id.*; *see also id.* § 1501.6(a)–(c) ("An agency shall prepare a [FONSI] if the agency determines, based on the [EA], not to prepare an [EIS] because the proposed action will not have significant effects."). Irrespective of its role in the NEPA decision tree, each EA must "[b]riefly discuss the purpose and need for the proposed action,

---

[2] When an agency makes its decision, it is required to "prepare and timely publish" a Record of Decision ("ROD"). 40 CFR § 1505.2(a). Here, the Phase II FONSI and ROD were published together.

alternatives [to the proposed action] . . . and the environmental impacts of the proposed action and alternatives . . . ." *Id.* § 1501.5(c)(2). EAs are not strictly required to go through public comment like EISs. *Id.* § 1501.5(e) ("Agencies shall involve the public . . . to the extent practicable in preparing [EAs]."); *see also* FAA Order 1050.1F § 6-2.2(g) ("Circulation of a draft EA for public comment should be considered but is optional at the discretion of the responsible FAA official.").

Third, and finally, a small subset of proposed actions that "normally do not have a significant effect" are categorically excluded from NEPA review. 40 C.F.R. §§ 1501.3(a)(1), 1501.4. In simpler terms, federal agencies determine "categories of actions" that normally do not have significant environmental impacts, and if a proposed action falls within such a category, then the action is allowed to proceed without being analyzed through a more onerous environmental review (such as an EIS or EA). *Id.* § 1501.4(a); *see also* FAA Order 1050.1F § 5-6 (listing actions that the FAA has categorically excluded from fuller environmental review).

With this general NEPA review framework in mind, we turn to the relevant procedural history in this case.

B. *The FAA's Review of Phase I*

There is more groundwork to be laid. Petitioners challenge the FAA's Phase II FONSI/ROD, but the FAA's previous

consideration of other Airport enhancements (*i.e.*, the "Phase I" developments) is an important part of their larger argument.[3]

In 2015, the City commissioned an Intermodal Feasibility Study to assess development opportunities for the Airport. The feasibility study indicated that the Airport was "ideally suited to undertake air cargo activity" because of its location, runway length, and logistics capabilities, among other advantages. The study opined that the Airport "could become a secondary international air cargo hub for one or more of the air cargo carriers serving [Miami International Airport]." But, for the Airport to attract this industry, the study indicated that it would have to construct air cargo facilities and invest in other improvements.

Accordingly, the City proposed a new Airport Layout Plan ("ALP") to the FAA.[4] The Phase I EA described the project as

---

[3] We note from the outset that the parties refer to the construction projects at the Airport as Phase I and Phase II. These terms were not used when the FAA was making its so-called Phase I determination. That is, when the FAA analyzed the City's initial 2016 proposal that we refer to as Phase I, the FAA did not view that project as the first part of a larger build-out. Rather, it viewed the proposal as a regular project in the normal course. The FAA was only informed of the City's "need for [Phase II] during construction of the initial [Phase I] air cargo facility." Nevertheless, for ease of reference, we also refer to the projects as Phase I and Phase II.

[4] ALPs are regulatory documents that reflect "the agreement between the FAA and the [City] regarding the proposed allocation of airport areas to specific operational and support functions." Airport Compliance Manual, FAA Order 5190.6B, Change 2, § 7.18 (Dec. 9, 2022); *see also* 49 U.S.C. § 47107(a)(16). A "sponsor," in this case the City, that is seeking to develop or make changes to an airport is required to complete an ALP that "depict[s] the airport's

"consist[ing] of constructing and operating up to three aircraft maintenance, repair and overhaul [] facilities and one air cargo facility[.]"  The construction of these four buildings was projected to "total approximately 223,000 square feet."  Other major project elements included constructing "approximately 78,400 yards of aircraft parking apron, apron taxilanes, and a connector taxiway" as well as "[c]onstruction of on-airport roads."[5]  These

---

boundaries, including all facilities, and to identify plans for future development on its ALP." *Id.*  As the FAA indicated in the Phase I EA, its unconditional approval of an ALP is a "federal action" subject to NEPA review: "The specific federal actions under consideration [in Phase I] include . . . [u]nconditional approval of the portion of the [ALP] that depicts the components of the Proposed Project and its connected actions pursuant to 49 U.S.C. Sections 40103(b), 44718, and 47107(a)(16), and Title 14 CFR Parts 77, 157, and 139."

[5] Additionally, the Phase I EA's "Related Project Elements" section included:

- Site preparation, including demolition of existing pavement, clearing and grubbing, excavation and embankment, and grading.

- Install new taxiway edge lights and airfield directional signs on the new connector taxiway.

- Construction [of] an aircraft staging apron and wash rack (with oil/water separator).

- Install exterior pole-mounted and building-mounted lighting for the new aircraft maintenance hangars, air cargo building, access roads, vehicle parking lots, and portions of aircraft parking aprons.

developments were projected to result in 820 additional "air cargo aircraft operations" per year by 2023.

After a draft EA for Phase I was made available for public review and comment, the FAA created a final EA and issued the Phase I FONSI/ROD approving the proposed Airport developments. The FONSI/ROD laid out the project's component parts, purpose, time frame, and potential alternatives to the proposed development, including that the proposed projects would not be developed at all (also known as the "No Action Alternative."). In pertinent part, the FONSI stated that "[n]o significant air quality, noise, or traffic impacts would occur" as a result of the proposed action, that there were no substantial cumulative effects associated with the development, and that, despite being available for public review and comment, "[n]o public comments were received on the Draft EA." In sum, the FAA determined that "the proposed Federal action [was] consistent with existing national environmental policies and objectives as set forth

---

- Extend utilities to the development sites, including electric, natural gas, water, sanitary sewer, and communications, and other related infrastructure.

- Construct stormwater management system improvements (e.g., inlets, swales, pipes, berms) and modify existing stormwater management system conveyances.

- Install security fencing and controlled access vehicle gates and pedestrian gates.

- Install landscaping[.]

in section 101 of [NEPA] and other applicable environmental requirements and [would] not significantly affect the quality of the human environment or otherwise include any condition requiring consultation pursuant to [NEPA]."

### C.  The FAA's Revalidation of Phase I

During the pendency of the FAA's NEPA review of Phase I, the City was engaged in preliminary talks with Amazon about bringing Amazon's air cargo operations to the Airport.  After Phase I was approved but before construction commenced, however, Amazon notified the City that it would require a different orientation of the air cargo facility and it anticipated a greater number of incoming and outgoing flights.  The City notified the FAA of these two changes via letter in 2018.  As to the site's orientation, the City stated: "Discussions with possible tenants ha[ve] determined that it would be more advantageous to their operations to orient the cargo building the opposite direction on the site."[6]  And it changed its projections for the number of flights that would be conducted by 2023—increasing total "air cargo aircraft operations" from 820 for the year to 5,840 for the year.  In the end, the City submitted that even with the revised site orientation and increased flight estimate, the Phase I EA remained accurate, and no formal reevaluation was necessary.

---

[6] The City continued: "This revision to the site plan reduces the project footprint slightly and also reduces the building size while allowing the site to be used more efficiently by the proposed tenant operator(s)."

The FAA agreed.  In a letter to the City, the FAA stated:

> The revised development plan would construct and operate the same types of facilities within the same study area evaluated in the [Phase I] EA and approved in the [Phase I] FONSI/ROD.  Other than an increase in cargo aircraft operations, the revised development plan did not identify any impacts that would be materially different than those identified and disclosed in the [Phase I] EA. . . . [T]here appears to be no changes to the action, or new circumstances or information, which would trigger the need for a Supplemental EA or an [EIS].

As such, the FAA approved the changes without going through a formal reauthorization process.

After the FAA's revalidation of Phase I, the City Commission unanimously approved a "Ground Lease Agreement with [Amazon]" for air cargo operations.  Construction of the air cargo facility was completed in July 2020 and Amazon commenced its air cargo operations.  In January 2020, before Phase I construction was completed, Amazon exercised its option to expand the air cargo facility, which required the City to seek FAA approval for "the expansion of the air cargo facility and related improvements" (*i.e.*, "Phase II").  The so-called Phase II developments included the expansion of the existing sort facility and office building; construction of a paved truck court, paved vehicle lot, concrete aircraft parking apron, pavement for aircraft ground support equipment, and a new airport access road;

extension of Taxiway A; installation of security fencing, gates, security checkpoints, aboveground fuel storage tanks and a fuel farm, and airfield lighting/signage; and modification of the Airport's stormwater management system.[7]

### D.  The FAA's Review of Phase II

The FAA issued a FONSI/ROD approving Phase II after analyzing an EA for Phase II prepared by the Airport Sponsor, considering public comments made to the draft EA for Phase II,[8] and determining that Phase II would not have significant environmental effects.  In relevant part, as to the environmental effect categories of air quality, noise, and cumulative impacts,[9] the

---

[7] Not all of these projects required FAA approval, *see, e.g.*, FAA Reauthorization Act of 2018, Pub. L. No. 115-254, 132 Stat. 3186, § 163 (codified at 49 U.S.C. § 47101) (limiting the types of airport projects that require FAA approval), but even those projects "depend[ed] on the portions of the project [that did] requir[e] FAA approval in order to be constructed or operated as planned."

[8] Petitioners provided public comment to the draft EA.  The Lowmans, for example, requested in part that "the FAA [] do whatever possible to abate the flight noise" from "Amazon flights."  Another set of Petitioners, the Stevenses, noted a similar concern: "My appeal to each of you is be certain that this air traffic growth is carefully measured and controlled before any further expansion of jets flying in and out of [the Airport] is approved."  Finally, Petitioner Bonnett expressed a concern that the increased flights and the lower altitude at which they were required to fly would increase the risk of a "collision between an airplane and a bird."

[9] "Cumulative impacts are those that result from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions, whether Federal or non-Federal. If the proposed action would cause significant incremental additions to cumulative impacts, an EIS is

final Phase II EA and FONSI/ROD included the following information and analysis.

To start, after laying out the alternatives to Phase II (including the No-Action alternative), the FAA considered the environmental effects that Phase II would have across 15 different categories.[10] One section dealt with cumulative impacts for which the FONSI noted that "[t]he impacts associated with [Phase II], when considered in addition to other cumulative projects, are not expected to exceed thresholds that would indicate a significant impact." The associated cumulative effects section of the EA was more detailed, as depicted by its table that studied the impact risk of 40 different sub-projects in Phase II across 14 different target categories, including air quality, noise, and hazardous materials, and its related "cumulative impacts summary" that offered a deeper dive on the aggregated effect in each category.

As to noise, the FAA noted that the increased air traffic would tangibly affect the sound generated over nearby land parcels.

_____

required." Environmental Impacts: Policies & Procedures, FAA Order 1050.1F § 2-3.2(b)(1) (July 16, 2015).

[10] Those categories included: Air Quality; Biological Resources; Climate; Coastal Resources; DOT Act, Section 4(f) Resources; Farmlands; Hazardous Materials, Solid Waste, and Pollution Prevention; Historical, Architectural, Archeological, and Cultural Resources; Land Use; Natural Resources and Energy Supply; Noise and Noise-Compatible Land Use; Socioeconomics, Environmental Justice, and Children's Environmental Health and Safety Risks; Visual Effects Including Light Emissions; Water Resources (including Wetlands, Floodplains, Surface Waters, Groundwater, and Wild and Scenic Rivers); and Cumulative Impacts.

But, the FAA noted that by 2027 there would only be three additional residences within the designated noise sensitive area (the FAA focuses its noise analysis on the "DNL 65 contour," which stands for a "Day-Night Average Sound Level" of 65 decibels, which is the threshold for significant noise). Those three residences "would not experience an increase [in sound] of 1.5 dB or greater." In other words, while there would be noise-related effects, those effects would not be significant.

Finally, as to air quality, the FAA noted that "[t]he additional aircraft operations and vehicle/truck trips associated with [Phase II] would increase air emissions at [the Airport]; however, the increase in emissions would not constitute a significant impact." And, in more technical terms, the Airport was in an attainment area for all National Ambient Air Quality Standards ("NAAQS"), which meant that there was no State Implementation Plan (required for non-attainment areas) that would have presented an additional hurdle to navigate. Stated simply, the air quality in the Airport's county was good, and any air quality affects from Phase II would not be significant enough to alter that status.

E.  *Additional Airport Projects*

In addition to the Phase I and Phase II developments, the FAA also approved at least two related Airport projects via categorical exclusion. The first project was to strengthen and

rehabilitate certain runways in late 2016. The second was to "upgrade [] the instrument landing system" in early 2021.

\* \* \*

Petitioners brought this petition for review of the FAA's Phase II FONSI/ROD alleging that the FAA's decision-making process violated NEPA in various ways.

## II.     Standard of Review

"We review an agency's final decision to determine whether it is arbitrary and capricious." *City of Oxford v. FAA*, 428 F.3d 1346, 1351 (11th Cir. 2005) (citing 5 U.S.C. § 706). "In the NEPA context, the reviewing court must ensure that the agency took a 'hard look' at the environmental consequences of the project." *Id.* (citing *Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209, 1216 (11th Cir. 2002)). "The agency need not have reached the same conclusion that the reviewing court would reach" because the agency's decision must only have a "rational basis." *Id.*; *see also Van Antwerp*, 526 F.3d at 1360 ("[A]n agency's NEPA decisions are only reviewed under the [Administrative Procedure Act's] highly deferential standard."). Accordingly, the reviewing court may only overturn the agency's decision if:

> (1) the decision does not rely on factors that Congress intended the agency to consider; (2) the agency failed entirely to consider an important aspect of the problem; (3) the agency offers an explanation which runs counter to the evidence; or (4) the decision is so

implausible that it cannot be the result of differing
viewpoints or the result of agency expertise.

*U.S. Army Corps*, 295 F.3d at 1216 (citing *Motor Vehicle Mfrs. Ass'n of
U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).
Finally, "we do not review an agency's compliance with NEPA by
asking whether it made optimal choices; NEPA does not require
perfection." *Citizens for Smart Growth v. Sec'y of Dep't of Transp.*, 669
F.3d 1203, 1215 (11th Cir. 2012) (holding that, because of this
deferential standard, "[a]ppellees' compliance with NEPA may not
have been perfect, but it was sufficient").

## III.    Discussion

In the petition for review, Petitioners argue that the FAA's
Phase II review process was fatally flawed.  Specifically, Petitioners
argue that the FAA violated NEPA in three ways: (1) improperly
segmenting the larger Airport overhaul into multiple, smaller
projects so that the overall environmental effect appeared lesser, (2)
failing to properly consider "cumulative impacts," and (3) failing to
analyze all air quality effects from the project.  The FAA responds
that Petitioners' challenge must be dismissed because they lack
standing or, alternatively, did not exhaust their administrative
remedies.  As to the merits, the FAA argues that its processes were
more than adequate to satisfy NEPA's requirements, and, therefore,
the petition for review must be denied.  We address each argument
in turn, starting with the procedural arguments (standing and
administrative exhaustion) before turning to the merits of
Petitioners' NEPA challenge.

A.    *Procedural Arguments*

i.    Standing

The FAA argues that Petitioners do not have Article III standing to bring this petition because they cannot show that (1) they have suffered a concrete and actual or imminent injury, (2) the complained-of injury was caused by the FAA's approval of Phase II, or (3) the complained-of injury would be redressed by a favorable decision. Petitioners disagree in all respects.

"We review issues of standing *de novo*." *See Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 833 F.3d 1274, 1279 (11th Cir. 2016).

> [T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). When, as here, an individual seeks to enforce a procedural right, "such as the right to challenge agency action unlawfully withheld," the standing analysis is simplified, and the individual does not have to meet "all the normal standards for redressability and immediacy." *Cahaba Riverkeeper v. U.S. Env't Prot.*

*Agency*, 938 F.3d 1157, 1162 (11th Cir. 2019) (quotations omitted); *see also Dep't of Educ. v. Brown*, 600 U.S. 551, __ (2023) ("We have found . . . that when a statute affords a litigant a procedural right to protect his concrete interests, the litigant may establish Article III jurisdiction without meeting the usual standards for redressability and immediacy." (quotations omitted)). Rather, in this situation, the individual has standing "if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Cahaba Riverkeeper*, 938 F.3d at 1162 (quotations omitted).

"To show a cognizable injury in fact in a procedural injury case, a plaintiff must allege that the agency violated certain procedural rules, that these rules protect a plaintiff's concrete interests and that it is reasonably probable that the challenged action will threaten these concrete interests." *Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1170 (11th Cir. 2006). For example, we held that an allegation that the National Forest Service "shirked" its duties under NEPA "easily" satisfied the injury requirement because "[i]t is well settled that, in a NEPA suit, 'a cognizable procedural injury exists when a plaintiff alleges that a proper EIS has not been prepared . . . when the plaintiff also alleges a concrete interest—such as an aesthetic or recreational interest— that is threatened by the proposed actions.'" *Id.* at 1169–71 (quoting *Sierra Club v. Johnson*, 436 F.3d 1269, 1278–79 (11th Cir. 2006)).

"Once . . . a plaintiff has established injury in fact under NEPA, the causation and redressability requirements are generally more relaxed." *Id.* at 1172. Causation is simplified because Petitioners "must demonstrate only that it is reasonably probable that the challenged actions will threaten [their] concrete interests." *Id.* And redressability is simplified because this Court "has the power to order the agency to comply" if we determine that the FAA has failed to adhere to NEPA's requirements. *Id.* at 1173.

As discussed previously, "NEPA establishes procedures that a federal agency must follow before taking any action." *Van Antwerp*, 526 F.3d at 1360. Petitioners allege that the FAA failed to adhere to NEPA in three distinct ways—*i.e.*, they assert a procedural injury. Petitioners also allege a concrete interest that is threatened by the FAA's action. Specifically, the Lowmans, for example, individually declared that they reside and own property near the Airport. They further declared that due to the implementation of the Phase II project, the area has experienced, and will continue to experience, increased air and truck traffic, resulting in "increased noise impact and environmental harm" that has "negatively impacted [their] qualify of life and health," and "damaged the value of [their] home and property." Petitioner Bonnett, who rents a residential home near the Airport, lodged similar complaints but focused on increased truck and air traffic, the noise related to that increased traffic, and the effect on

petitioner's "quality of life and health."[11]  Thus, they have satisfied the injury in fact requirement.  *See Ouachita Watch League*, 463 F.3d at 1170 ("'To show a cognizable injury in fact in a procedural injury case, a plaintiff must allege that the agency violated certain procedural rules, that these rules protect a plaintiff's concrete interests and that it is reasonably probable that the challenged action will threaten these concrete interests.'").

Because it is "reasonably probable" that Phase II will affect their "concrete interest" in the air quality, noise, and traffic in their area and property values, Petitioners have satisfied the causation and redressability requirements as well.  *Ouachita Watch*, 463 F.3d at 1172.  And, because we can require the FAA to redo their NEPA analysis if we determine that it is incomplete or otherwise insufficient, this harm is redressable.  *See* 5 U.S.C. § 706 (providing, in pertinent part, that reviewing courts shall "compel agency action unlawfully withheld . . . .").

In sum, Petitioners have satisfied the constitutional standing requirements for procedural injuries.[12]  *See Cahaba Riverkeeper*, 938

---

[11] The Stevenses did not provide an individual declaration detailing their injuries.  Because the Lowmans and petitioner Bonnett have proven standing through their declarations and comments, however, we proceed to analyze the petition at issue.  *See generally Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) ("At least one plaintiff must have standing to seek each form of relief requested in the complaint.").

[12] The FAA does not challenge whether Petitioners have a valid cause of action to bring this petition for review.  Accordingly, we simply note that (a) NEPA challenges are brought under the Administrative Procedure Act ("APA"), (b) the APA requires only a "final agency action" that adversely affects Petitioners

F.3d at 1162 ("[W]hen a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." (quotations omitted)).

### ii. Administrative Exhaustion

The FAA also argues that Petitioners' challenge must be dismissed because they "did not raise any of the issues presented in [their] opening brief during the administrative process" (*i.e.*, the public comment period). Petitioners counter by pointing to two exceptions to the general rule that Petitioners must exhaust their administrative remedies by raising relevant objections during the agency's public comment period. According to petitioners, those two exceptions are that "commenters need not point out an environmental assessment's flaw if it is obvious" and "a commenter does not waive an issue if it is otherwise brought to the agency's attention."

As an initial matter, the FAA is correct that the general rule is that NEPA petitioners must exhaust their administrative

---

to show standing, and (c) "[i]t is well settled that a final [environmental analysis] or the record of decision issued thereon constitute[s] final agency action." *Ouachita Watch*, 463 F.3d at 1173 (quotations omitted); *see also Newton v. Duke Energy Florida, LLC*, 895 F.3d 1270, 1274 n.6 (2018) ("Under [*Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)], the [standing] question is whether [Petitioners] have a valid cause of action . . . ."). Petitioners easily satisfy these requirements.

remedies before petitioning this Court.  Under 49 U.S.C. § 46110(d), we have jurisdiction to "consider an objection to an order of the . . . Administrator of the [FAA] only if the objection was made in the proceeding conducted by the . . . [FAA]."  Further, "[u]nder ordinary principles of administrative law, a reviewing court will not consider arguments that a party failed to raise in timely fashion before the administrative agency."  *Vidiksis v. EPA*, 612 F.3d 1150, 1158 (11th Cir. 2010); *see also Zukas v. Hinson*, 124 F.3d 1407, 1410 n.6 (11th Cir. 1997) (noting that "[b]ecause [petitioner] failed to raise [two specific] objections before the [administrative law judge] or [National Transportation Safety Board], we need not address them"); *Bradshaw v. Fed. Aviation Admin.*, 8 F.4th 1215, 1222 (11th Cir. 2021) ("Because Bradshaw failed to raise [his argument that the FAA followed improper procedures in terminating his designation] before the FAA appeal panel, we cannot consider it.").  But there is an exception if "there was a reasonable ground for not making the objection in the proceeding."  49 U.S.C. § 46110(d).  "[T]he agency bears the primary responsibility to ensure that it complies with NEPA, and an EA's or an EIS'[s] flaws might be so obvious that there is no need for a commentator to point them out specifically in order to preserve its ability to challenge a proposed action."  *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 765 (2004) (dicta) (internal citation omitted).

During the public comment period for the Phase II draft EA, Petitioners participated in the administrative process by providing comments expressing general concern over the additional Airport expansion.  The Lowmans primarily expressed concern about the

increase in flight noise and Bonnett focused on the risk that the increase in flights posed to the bird population. These comments, however, touched on generalized issues that are not the subject of this petition. Thus, we must analyze the discrepancy between Petitioners' generalized comments during the public review period and their more specific arguments as part of this petition to determine whether there was a "reasonable ground" for Petitioners not to raise the arguments they currently make because the FAA committed an "obvious" mistake in its NEPA review. 49 U.S.C. § 46110(d); *Public Citizen*, 541 U.S. at 765.

Under NEPA, the FAA is required to conduct certain reviews, 42 U.S.C. § 4332(2)(C), and it has regulations mandating that it consider the issues that Petitioners raise in this petition. Specifically, on segmentation, the FAA's regulations provide that "[a] proposed action cannot be segmented by breaking it down into small component parts to attempt to reduce impacts." FAA Order 1050.1F § 2-3.2(b)(1). Similar requirements exist for analyzing cumulative impacts, *id.* § 2-3.2(b)(2) (providing that "[c]umulative actions [that] when viewed with other proposed actions, have cumulatively significant impacts" "should be discussed in the same EIS [as one another]"), and the effect on air quality, *id.* § 4-3.3 (exhibit 4-1) (describing the significant threshold for air quality as when an "action would cause pollutant concentrations to exceed one or more of the National Ambient Air Quality Standards"). Thus, because the FAA—according to its own regulations—was supposed to have analyzed Phase II's cumulative impacts and effect on air quality as well as refrain from segmenting the Airport

projects, the Petitioners were not obligated to point out obvious flaws in the FAA's NEPA analysis on these issues.  Accordingly, we conclude that Petitioners had "reasonable grounds" for not raising their instant arguments previously.[13]  49 U.S.C. § 46110.

B.    *Merits Arguments*

Having concluded that Petitioners have standing and having addressed the exhaustion issue, we now consider Petitioners' main argument that the FAA failed to adhere to NEPA's requirements in issuing its FONSI/ROD which greenlighted Phase II.  Petitioners look back in time to argue that the FAA improperly segmented the various Airport projects and conducted an inadequate cumulative impacts analysis.  They also argue that the FAA failed to properly analyze Phase II's potential effect on air quality.  We address each argument in turn.

i.    Segmentation

In simple terms, Petitioners argue that the Airport renovations were improperly considered as separate projects rather

---

[13] We note as well that this conclusion is consistent with the general purpose of administrative exhaustion—notice.  *See, e.g.*, *Chandler v. Crosby*, 379 F.3d 1278, 1287 (11th Cir. 2004) ("[T]he purpose of administrative exhaustion, . . . is 'to put the [administrative authority] on notice of all issues in contention and to allow the [authority] an opportunity to investigate those issues.'" (alterations in original) (quoting *Griffin v. Carlin*, 755 F.2d 1516, 1531 (11th Cir. 1985)).  Here, the FAA was required to consider segmentation, cumulative impacts, and air quality and, therefore, was on notice of those predominant issues even if Petitioners never raised those arguments during the public comment period.

than one larger Airport build-out (*i.e.*, Phase I, Phase II, and the other projects in-between were really just subcomponents of one larger Airport project that the FAA should have analyzed together to determine the true environmental impact). But Petitioners' argument lacks evidence and boils down to an untimely challenge against the FAA's previous decisions.

The FAA directs its officials to consider "connected actions and other proposed actions or parts of proposed actions that are related to each other closely enough to be, in effect, a single course of action" in "the same EA or EIS." FAA Order 10501.F § 2-3.2(b)(1) (citing 40 C.F.R. §§ 1502.4(a), 1508.25(a)(1)); *see also Kleppe v. Sierra Club*, 427 U.S. 390, 410 (1976) (explaining that "[a] comprehensive impact statement may be necessary" in some cases, including "when several [proposed actions] that will have cumulative or synergistic environmental impact upon a region are pending concurrently before an agency"). Relatedly, "[a] proposed action cannot be segmented by breaking it down into small component parts to attempt to reduce [environmental] impacts." FAA Order 10501.F § 2-3.2(b)(1) (citing 40 C.F.R. § 1508.27(b)(7)); *see also Pres. Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs.*, 87 F.3d 1242, 1247 (11th Cir. 1996) (noting that "the [Army Corps of Engineers] cannot 'evade [its] responsibilities' under [NEPA] by 'artificially dividing a major federal action into smaller components, each without a "significant" impact'" (citing *Coal. on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 68 (D.C. Cir. 1987))); *see also Taxpayers Watchdog, Inc. v. Stanley*, 819 F.2d 294, 298 (D.C. Cir. 1987) ("The rule against segmentation was developed to

[e]nsure that interrelated projects the overall effect of which is environmentally significant, not be fractionalized into smaller, less significant actions.").

We have also recognized, however, that "just because [a] project at issue connects existing highways does not mean that it must be considered as part of a larger highway project; all roads must begin and end somewhere." *Pres. Endangered Areas of Cobb's History, Inc.*, 87 F.3d at 1247. In other words, the simple fact that two projects are related does not mean that those projects must necessarily be considered as part of one larger project. Similarly, proving that a project was segmented requires more than merely showing that a series of related projects were approved sequentially—after all, EA's and EIS's are "forward-looking instrument[s]" designed "to assist in evaluating proposals for major federal action," and we must remain mindful that we, of course, are reviewing them with the added benefit of hindsight. *See Aertsen v. Landrieu*, 637 F.2d 12, 19 (1st Cir. 1980) (quotation omitted); *see generally Churchill Cnty. v. Norton*, 276 F.3d 1060, 1082 (9th Cir. 2001) (rejecting a segmentation claim because "[p]laintiffs [did] not show that the [agency] acted arbitrarily or capriciously"). Indeed, for an agency to segment a larger project into component parts, the agency would necessarily have to know about the entire proposal on the front end. *See City of Oxford*, 428 F.3d at 1356 (recognizing this timing disparity in a similar context and determining that because there was "no concrete plan to consider" and little indication that the sponsor planned to construct a new building, "investigators and researchers would be forced to analyze the

environmental impact of a project, the parameters and specifics of which would be a mere guess").

To review, a simplified timeline of the project approvals at issue in this case is as follows.  Phase I was approved in 2016.  After two years of inaction, Phase I—including the changes to the orientation of the air cargo facility and increase in flight traffic—was revalidated in 2018.  The FAA also approved a runway rehabilitation project via categorical exclusion in 2019.  The projects approved in Phase I, such as the air cargo facility, became operational in 2020.  The FAA approved another project—the upgrade of the instrument landing system—via categorical exclusion in early 2021.  Finally, Phase II was approved in late 2021.[14]

We note that Petitioners' challenge, in many ways, boils down to an untimely objection to the FAA's approval of Phase I (and/or the other Airport projects that were previously approved via categorical exclusion).  That is, Petitioners' arguments are focused on the past, not the actual processes of Phase II, which is the only action we are empowered to review.  *See* 49 U.S.C. § 46110(a) (limiting the time period for filing a petition for review of the FAA's orders to "no[] later than 60 days after the order is issued").  Thus, to the extent that Petitioners are actually challenging Phase I or other previous approvals, such challenges are untimely and inappropriate.  *See, e.g.*, *Clayton Cnty. v. FAA*, 887

---

[14] Petitioners also reference the construction of a fuel farm.  That project, however, is already included as part of Phase II's ALP and the EA.

F.3d 1262, 1267 n.3 (2018) ("Petitioners do not challenge the FAA's [two-year old] policy clarification, likely because such a challenge would be untimely." (citing 49 U.S.C. § 46110(a)).

        Turning to Phase II itself, the ultimate analysis of the segmentation claim proves simple.  Petitioners' claim fails because they offer no evidence that the FAA broke Phase I, Phase II, and the other Airport-related projects apart to avoid a more onerous environmental review.  To start, Petitioners' argument that the Airport projects are connected actions that lack independent utility (and thus should have been considered together rather than as separate projects) is entirely conclusory.  While the projects were proposed and approved sequentially, that fact alone is not enough for us to conclude that the FAA improperly segmented these projects.  Rather, looking to the record, it is clear Phase II was not pending before the FAA (or seriously contemplated) when it approved Phase I.  *See Kleppe*, 427 U.S. at 410 (focusing on the need for a "comprehensive impact statement" when multiple related actions are "pending concurrently before an agency").  Indeed, the only reference to future Airport projects at the time was the observation in the Phase I EA that future projects could be undertaken "as demand dictate[d]."  For obvious reasons, this one-off observation about an entirely speculative, not-yet-proposed future development is insufficient to prove that the FAA arbitrarily and capriciously violated NEPA's mandate against segmentation.  *See City of Oxford*, 428 F.3d at 1356 (guarding against holdings that would require "investigators and researchers" to "analyze the

environmental impact of a project, *the parameters and specifics of which would be a mere guess*" (emphasis added)).

The deficiencies of Petitioners' challenge are even clearer when compared to the facts of a case they cite repeatedly—*Delaware Riverkeeper Network v. Federal Energy Regulatory Commission*, 753 F.3d 1304 (D.C. Cir. 2014). In *Delaware Riverkeeper*, Tennessee Gas Pipeline Company, L.L.C., submitted four separate project proposals to the Federal Energy Regulatory Commission ("FERC") for upgrade work on one section of pipeline. *Id*. at 1308. FERC's approval of one project (the "third upgrade project," to use the D.C. Circuit's terminology) was challenged on segmentation grounds. *Id*. The D.C. Circuit held, in part, that FERC improperly segmented the proposed actions in part because "the first upgrade project was under construction" and "the applications for the second and fourth upgrade projects were *pending before FERC*" when it approved the project at issue. *Id*. at 1308, 1318.

Whereas FERC considered the pipeline projects separately despite the fact that they were pending at the same time, there is no evidence in the instant case that the FAA manipulated its processes in a similar way. Phase I was approved in 2016 and Phase II was not even proposed until 2020 when the construction of Phase I was well underway.[15] While *Delaware Riverkeeper* may be a

---

[15] And while there were other projects that were approved via categorial exclusion, the consideration of those projects did not temporally overlap with the FAA's consideration of Phase II (or were otherwise properly treated as categorial exclusions) and did not need to be considered as part of Phase II.

prime example of segmentation, it is clear that the FAA's actions in the instant case in no way resemble FERC's violative processes in that case.

Further, to the extent that Petitioners' segmentation arguments capitalize on hindsight (*i.e.*, looking back at the Airport developments since 2016 to make it appear like the FAA pushed the Airport projects through in piecemeal fashion), we first reemphasize that NEPA's environmental assessments are forward-looking and created to provide agency actors with up-to-date information to aid their decision-making. *Landrieu*, 637 F.2d at 19; *see also Nat'l Wildlife Fed. v. Appalachian Reg. Comm'n*, 677 F.2d 883, 890 (D.C. Cir. 1981) ("Where, for instance, substantial construction of a project has already been realized, the 'forward-looking' criterion suggest that where new construction is necessary to finish off work already done, the new work does not trigger an obligatory EIS evaluating program-wide effects."). And second, to reiterate, the fact that a series of projects have been approved over a set period of time is not enough—without other evidence—to prove that an agency was improperly segmenting its review process in contravention of NEPA. Here, Petitioners have presented no such evidence.

Petitioners offer two additional arguments on segmentation.

First, Petitioners rely on *Western North Carolina Alliance v. North Carolina Department of Transportation*, 312 F. Supp. 2d 765 (E.D.N.C. 2003), to argue that the Phase I and Phase II projects were impermissibly segmented because "[t]he lease agreement

between Amazon and the City made the expansion of the facility inevitable," thereby effectively eliminating all viable alternatives to the project. Petitioners essentially argue that—if (a) the approval of Action 1 would (b) also require Action 2 to be undertaken, then (c) there is no true "alternative" to Action 2, so that (d) Action 1 and Action 2 should be considered together and not segmented from one another. In other words, because the lease to the air cargo facilities gave Amazon a right of expansion, and if Amazon exercised that right, the City could not refuse the expansion, the FAA was required to analyze Phase I and Phase II together.

Petitioners' argument fails. The only legal support they cite is an out-of-circuit, district court case that carries no precedential value. *See W. N.C. Alliance*, 312 F. Supp. 2d 765. Regardless, that case is distinguishable. In *Western North Carolina Alliance*, the North Carolina Department of Transportation addressed interconnected road projects such that "[i]f I-4400 [was] expanded to six lanes [Action 1], then I-4700 . . . [would] have to be expanded as well [Action 2]." *Id*. In other words, there was no real alternative to Action 2 because the outcome was predetermined. In the instant case, however, the City's contract with Amazon in no way required the FAA to approve Phase II. That is, while the City may have been contractually obligated to go along with the expansion, the FAA was free to fully consider each alternative and, ultimately, deny Phase II if it determined that the project's environmental effects were too significant.

Second, Petitioners argue that the FAA should have prepared a "supplemental [EA for Phase I], not a separate [EA for Phase II]." Supplemental environmental assessments for a project are required if: "(1) there are substantial changes to the proposed action that are relevant to environmental concerns, or (2) there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." *See* FAA Order 1050.1F, § 9-3; *Van Antwerp*, 526 F.3d at 1360 ("In some cases, after an agency publishes a FONSI or an EIS, but before any action is taken, the proposed action changes . . . [so] the agency must make an additional NEPA determination" and may have to prepare a supplemental environmental analysis). The instant case, however, was never a candidate for a supplemental analysis because the Phase II project was not an addition to a pending proposed action but rather an all-new proposal—indeed the Phase I project had already been implemented. Thus, a supplemental EA to Phase I was not required. And, to the extent that Petitioners take issue with Phase I, we have explained that such a challenge is untimely.

For all these reasons, Petitioners' segmentation argument fails.

### ii.  Cumulative Impacts

Next, Petitioners argue that the FAA failed to "take into consideration the cumulative impact of its past actions." They argue that the FAA failed to follow NEPA because the FAA's Phase II analysis did not adequately account for the cumulative impacts of (a) Phase I, (b) the other Airport development projects it

approved via categorical exclusion, and (c) Phase II. Within their larger cumulative impacts argument, Petitioners advance four sub-arguments: (1) the FAA's cumulative impact analysis is inadequate, (2) the FAA did not consider the cumulative impact of its past actions, (3) the FAA's use of the DNL 65 dB corridor is unduly restrictive, and (4) the FAA's use of the "no action" alternative is the wrong noise baseline. We address each argument in turn.

The FAA's regulations provide: "Cumulative impacts are those that result from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions, whether Federal or non-Federal. If the proposed action would cause significant incremental additions to cumulative impacts, an EIS is required." FAA Order 1050.1F § 4-2(d)(3).[16] While the regulations clearly require a cumulative impacts analysis, they do not detail the required form of such analysis. *Id.* Nevertheless, we have identified certain considerations that "[a] cumulative impact analysis must identify," including:

> (i) the area in which the effects of the proposed project will be felt, (ii) the impact expected in that area, (iii) those other actions—past, present, and proposed, and reasonably foreseeable that *have had or*

---

[16] This definition of cumulative impacts is consistent with CEQ's definition of "cumulative impacts" that was in effect at the time of the FAA's decision in 2020. *See* 40 C.F.R. § 1508.7 (2020). We note that, in 2022, CEQ's regulations were amended, and the term "cumulative impacts" was changed to "cumulative effects," and the definition (which remained the same except for the change in terminology) was recodified in § 1508.1(g)(3) (2022).

> *will have impact in the same area*; (iv) the effects of those
> other impacts; and (v) the overall impact that can be
> expected if the individual impacts are allowed to
> accumulate.

*City of N. Miami v. Fed. Aviation Admin.*, 47 F.4th 1257, 1270 (11th
Cir. 2022) (quoting *Sierra Club v. FERC*, 827 F.3d 36, 49 (D.C. Cir.
2016) (emphasis in original)).   While the analysis must identify
certain considerations, the "determination of the extent and effect
of [the cumulative impact] factors, . . . is a task assigned to the
special competency of the appropriate agencies." *Kleppe*, 427 U.S.
at 414.   Finally, the cumulative effects must be directly correlated
with the project at issue—otherwise they are not properly
considered as part of that project's environmental analysis.  *See
C.A.R.E. Now, Inc. v. FAA*, 844 F.2d 1569, 1575 (11th Cir. 1988)
("[C]umulative impacts include only the indirect and direct effects
caused by a project" and do not include "speculation" (emphasis
omitted)).

Petitioners' first two sub-arguments—that the FAA's
cumulative impact analysis was inadequate and the FAA did not
consider the cumulative impact of its past actions—are so closely
related that they are properly considered together.  Turning to the
cumulative impacts section of the Phase II EA, it is clear that the
FAA's analysis was rigorous and detailed, and covered all of the
factors that we have identified as necessary to include.  Specifically,
in its final Phase II EA, the FAA assessed the cumulative impacts of
40 different actions—past, present, and future—across 14 different
fields (air quality; biological resources; climate; coastal resources;

hazardous materials; cultural resources; land use; natural resources/energy; noise; socio-economics/environmental justice; light emissions/visual; wetlands; floodplains; and water resources) and determined the extent of the environmental effect on each of these fields. Then, after conducting this analysis, the FAA aggregated the effects to complete the cumulative effects analysis. Accordingly, we conclude that Petitioners' contentions that the cumulative impacts analysis was inadequate is without merit.

Resisting this conclusion, Petitioners argue that the Phase II EA was "unduly restrictive" because the FAA, in its analysis of noise impacts, limited its study to the 65 DNL contour although it "knew that the Phase II expansion would have impacts on noise levels far beyond the boundaries of the 65 DNL contours." Critically, however, the FAA's regulations provide that "[a]n airport environs study area must be large enough to include the area within the DNL 65 decibels (dB) contour, *and may be larger*." FAA Order 1050.1F, App'x B., § B-1.3 (emphasis added). Thus, while Petitioners may have hoped the study would span a larger area, the FAA did exactly what it was required to do in its EA (study the area within the DNL 65 contour).

Finally, Petitioners argue that "[the] FAA's use of 'no action' conditions for its noise baseline fails to capture the impacts of noise from [the] FAA's actions prior to the project." Essentially, their argument is that the "no action" baseline (*i.e.*, if Phase II were not undertaken) is an insufficient comparator because it does not take into consideration the cumulative impacts that will result from the

previous airport projects.  But, as we recognized in *City of North Miami*, the FAA's Desk Reference on Cumulative Impact Analysis provides that "[the] FAA has discretion to determine whether, and to what extent, information about the specific nature, design, or present impacts of a past action are useful for the analysis of the impacts of the proposed action and alternative(s)."  *City of N. Miami*, 47 F.4th at 1271.[17]  Here, as we have described, the FAA's cumulative effects analysis was robust, and it clears this low bar.[18]

---

[17] Petitioners rely on *Grand Canyon Trust v. Federal Aviation Administration*, 290 F.3d 339 (D.C. Cir. 2002).  In addition to being out-of-circuit precedent, it is distinguishable from the instant case.  In *Grand Canyon Trust*, the FAA conducted an EA concerning how a proposal to move an airport would affect noise levels at a nearby park.  *Id*. at 340.  The EA concluded that the incremental difference in air traffic noise between the two locations was insignificant.  *Id*.  The D.C. Circuit held that the EA was arbitrary and capricious because the EA considered only the change in noise related to flight traffic at the different locations, without considering how the increased air traffic noise tied in with other existing noises at the park.  *Id*. at 345–47. But unlike the EA in *Grand Canyon Trust*, the EA here accurately considered the existing soundscape and aggregated the total noise.

[18] Petitioners also invoke NEPA's purpose to argue that the FAA's analysis did not provide useful information to the public.  For one, the public information component is only part of NEPA's purpose.  *See Black Warrior Riverkeeper*, 833 F.3d at 1278–79 ("NEPA serves the dual purpose of informing agency decisionmakers of the environmental effects of proposed federal actions and ensuring that relevant information is made available to the public . . . .").  And, for two, the tables as well as the FAA's written descriptions of the cumulative effects do, in fact, provide extensive information to the public.

iii.  Air Quality

Petitioners' last argument is that the "FAA violated NEPA by failing to analyze all air quality impacts," meaning that the FAA should have conducted additional air quality analyses.  Once again, Petitioners' argument is multi-faceted.  We address each part of their argument in turn.

Starting with their broadest argument, Petitioners argue that the FAA's air quality analysis was too limited because it did not extend to "all air quality impacts."  Petitioners, however, lose sight of the role of the environmental analyses under NEPA. Specifically, an EA is intended to gauge whether there are "significant" impacts so that (a) if there are "significant" impacts an EIS can be created, and (b) if there are not "significant" impacts a FONSI can be issued so that the project can proceed.  *See Sierra Club*, 295 F.3d at 1215 ("The EA should provide enough evidence and analysis to guide the agency to one of two conclusions: (1) a finding that the project will have a significant effect [which would require the preparation of an EIS], or (2) a finding of significant impact ('FONSI').").

To bring this broader point into focus, we look to the FAA's regulations.  For air quality, the FAA describes the "significance" threshold in the following way: "The action would cause pollutant concentrations to exceed one or more of the National Ambient Air Quality Standards (NAAQS) . . . [or] increase the frequency or severity of any such existing violations."  The FAA studied exactly

this standard by focusing on the significance threshold to
determine if it would be surpassed:

> Air Quality – Polk County is located in an attainment
> area for all National Ambient Air Quality Standards
> (NAAQS) for criteria air pollutants and is not subject
> to the requirements of a State Implementation Plan.
> Construction activities would generate temporary air
> emissions at [the Airport] from equipment and
> vehicle exhaust, as well as, fugitive dust during
> excavation and grading activities.  The EA notes
> typical measures that can be taken by contractors to
> reduce air emissions during construction.
>
> Operational emissions associated with the No-Action
> Alternative and the Proposed Development Project
> were computed for study years 2022 and 2027 using
> FAA's Aviation Environmental Design Tool (AEDT).
> The emissions inventories in Section 5.2.1.2 of the EA
> compares emissions from the No-Action Alternative
> and Proposed Development Project.  The additional
> aircraft operations and vehicle/truck trips associated
> with the Proposed Development Project would
> increase area emissions at [the Airport]; however, the
> increase in emissions would not constitute a
> significant impact.
>
> The Proposed Development Project occurs in an area
> classified as Attainment for all criteria air pollutants,
> and there is no State Implementation Plan or numeric
> significance threshold applicable to the Proposed
> Development Project.      However, the      EA
> demonstrated that even if stringent de minimis

thresholds were in place for Polk County, the anticipated air emissions would not exceed thresholds indicating a significant impact.

The FAA, after studying the issue determined that a FONSI/ROD was proper because Phase II would not have a significant impact. Thus, the FAA did what it was required to do under NEPA and its regulations interpreting NEPA. Petitioners' contention that the FAA should have done more is merely the expression of a policy preference.

Petitioners do not stop there. They also cite to a passage in FAA Order 1050.1F that provides that additional air quality analyses are required in "extraordinary circumstances." FAA Order 1050.1F § 5-2(b)(8).[19] The problem for Petitioners is that this excerpt comes from Chapter 5, which is about Categorial Exclusions—and the Phase II project was not a categorical exclusion. Indeed, even if this section applied, if there was an "extraordinary circumstance," the proper response would be for the FAA to conduct "further analysis in an EA or an EIS." Thus, even if Petitioners were correct, they would not gain anything as the FAA already prepared an EA that did not reveal any significant air quality impacts.

---

[19] This section of FAA Order 1050.1F provides that "[e]xtraordinary circumstances are factors or circumstances in which a normally categorially excluded action may have a significant environmental impact that then requires further analysis in an EA or an EIS." FAA Order 1050.1F § 5-2(a). It continues to list circumstances that qualify as "extraordinary," including: "[a]n impact on air quality or violation of Federal, state, tribal, or local air quality standards under the Clean Air Act . . . ." *Id.* § 5-2(b)(8).

Finally, Petitioners also argue that the FAA acted arbitrarily or capriciously in failing to discuss hazardous air pollutants ("HAPs") in the Phase II EA, when there were several potential sources for HAPs in the Phase II project. Simply put, such an analysis is outside of the FAA's air quality requirements and was not required for this project.[20]

Accordingly, Petitioners' arguments fail because the FAA properly analyzed air quality according to its regulations interpreting NEPA.[21]

## IV.    Conclusion

Petitioners are unhappy that the FAA greenlighted Phase II (as well as the Airport developments preceding Phase II). But we do not vacate agency decisions over mere policy disagreements. Upon close inspection, we deny Petitioners' petition for review because the record is clear that the FAA followed its regulations

---

[20] Petitioners point us to a 2009 guidance document (Guidance for Quantifying Speciated Organic Emissions from Airport Sources) that is not in the record. FAA, Office of Env't & Energy, Guidance for Quantifying Speciated Organic Gas Emissions from Airport Sources (Sept. 2009), at 14–15. Even if we were to consider the guidance document, we would conclude that the FAA was not required to conduct a HAPs analysis for Phase II. The guidance provides types of "major" projects (requiring a HAPs analysis) that are dissimilar to Phase II. Additionally, Phase II is not located in the type of area where the guidance document indicates that such analyses would be required (*e.g.*, nonattainment areas).

[21] Because we agree with the FAA that Petitioners' arguments lack merit, we do not reach the FAA's final argument that we "should deny [Petitioners'] requested relief because [they] have not established that vacatur is warranted."

interpreting NEPA and did not improperly segment the Airport development projects, fail to consider cumulative impacts adequately, or neglect its air quality analysis.  In other words, the FAA did what it was supposed to do, and its review processes were not arbitrary and capricious.

**Petition DENIED.**